1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

7
8  SERVICELINK NLS, LLC, a Delaware
   Limited Liability Company; and         NO.
9  SERVICELINK AGENCY SALES &
   POSTING, LLC, a California Limited      COMPLAINT
10 Liability Company,

11          Plaintiffs,

12     v.

13 CHRIS REBHUHN and MEREDITH
   REBHUHN, spouse and spouse; and
14 NICHOLAS LAVANDIER and ALETA
   LAVANDIER, spouse and spouse,

15          Defendants,

16
17     COME NOW Plaintiffs ServiceLink NLS, LLC, and ServiceLink Agency Sales &

18 Posting, LLC, (collectively "ServiceLink") and for their causes of action against Defendants

19 Chris and Meredith Rebhuhn, and Nicholas and Aleta Lavandier, allege as follows:

20                      **I.     PARTIES AND JURISDICTION**

21     1.1     ServiceLink NLS, LLC, ("NLS") is a limited liability company organized and

22 existing under the laws of the state of Delaware, having its principal place of business at 1400

23 Cherrington Parkway, Moon Township, PA 15108.

24     1.2     ServiceLink Agency Sales & Posting, LLC ("ASAP") is a limited liability

25 company organized and existing under the laws of the State of California, having its principal

26 place of business at 3210 El Camino Real, Irvine, CA 92602.

COMPLAINT – 1

1.3    At all relevant times herein, ServiceLink was in the business of providing title and foreclosure services related to defaults on real estate mortgages.

1.4    Defendant Chris Rebhuhn ("Rebhuhn") is a resident of the State of Washington who, at all relevant times, owned fifty-one percent (51%) of the capital stock of Regional Trustee Services Corp., also known as Old RTSC Corp., (hereinafter "RTSC"). Rebhuhn was also the President, Chairman, and a Director of RTSC.    Rebhuhn is the current President and a Director of RTS Pacific, Inc. ("RTS Pacific").    Upon information and belief, Rebhuhn resides at 46519 Southeast 129th St., North Bend, WA 98045.  Defendant Meredith Rebhuhn ("Ms. Rebhuhn") is believed to be the spouse of Rebhuhn.  All acts alleged herein were for the benefit of Rebhuhn individually and his marital community.

1.5    Defendant Aleta Lavandier ("Lavandier") is a resident of the State of Washington who, at all relevant times, owned forty-nine percent (49%) of the capital stock of RTSC.  Upon information and belief, Lavandier resides at 7142 Northeast William Rogers Road, Indianola, WA 98342.  Defendant Nicholas Lavandier ("Mr. Lavandier") is the spouse of Lavandier.  All acts alleged herein were for the benefit of Lavandier individually and her marital community.

1.6    This action arises from Defendants' conversion and misappropriation of monies owed to and held in trust for ServiceLink.  RTSC had already collected millions of dollars of funds paid as reimbursable expenses for services provided by ServiceLink when Defendants, as owners of RTSC, conducted a sale of substantially all of the assets of RTSC, including all RTSC accounts receivable and additional reimbursable expenses owed to ServiceLink, and then placed RTSC into receivership.  The Receivership schedules show that money collected and held in trust for ServiceLink, like the accounts receivable sold on the eve of receivership, had vanished.    ServiceLink believes and therefore alleges that Defendants utilized the ServiceLink funds to furnish a lavish lifestyle, and the asset sale and receivership were simply the final steps of a concerted effort by Defendants to misappropriate and convert

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1  funds owed to ServiceLink, protect their ill-gotten wealth, and shield themselves from
2  liability.

3  ## II.    JURISDICTION AND VENUE

4     2.1    This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332(a)(1)
5  because ServiceLink and Defendants are citizens of different states, and ServiceLink seeks
6  damages in an amount in excess of $75,000, exclusive of interests and costs.

7     2.2    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(2) because the
8  Western District of Washington is the judicial district in which Defendants reside and where a
9  substantial part of the events and omissions giving rise to ServiceLink's claims occurred.

10  ## III.    FACTS

11  ### A.    Funds Earmarked for ServiceLink

12     3.1    Defendants Rebhuhn and Lavandier are the sole owners of RTSC, a
13  Washington corporation who is in the business of providing non-judicial foreclosure services.

14     3.2    Since 2008, ServiceLink has continuously furnished certain title, publishing,
15  posting and ancillary foreclosure services to RTSC and its customers on an on-going and as-
16  need basis for agreed upon and established fees pursuant to contractual agreements between
17  RTSC and ASAP and NLS.

18     3.3    As early as 2008, RTSC maintained a contractual relationship with Lender
19  Processing Services, Inc. ("LPS"), through LPS's subsidiaries Agency Sales and Posting, Inc.
20  and LSI Title Company d/b/a Default Title and Closing.   Pursuant to their contractual
21  agreements, LPS provided publishing and posting services related to non-judicial foreclosures
22  for RTSC and its clients.

23     3.4    On January 2, 2014, ServiceLink's parent company, Fidelity National
24  Financial, Inc. ("Fidelity"), acquired LPS and its subsidiaries. All of the former LPS
25  businesses were reorganized such that LPS's transactional businesses are now operated by
26  ServiceLink.   As a result of this acquisition, ServiceLink is the owner of LPS's and its

COMPLAINT – 3

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

SER004-0001 2849113.docx

1    subsidiaries' accounts for transactional services provided in relation to real estate

2    foreclosures, including LPS's contractual agreements with RTSC (the "Service Agreements").

3        3.5    In accordance with the Service Agreements, ServiceLink continued to

4    regularly and routinely furnish certain title and ancillary foreclosure services to RTSC and its

5    customers on an on-going and as-needed basis for agreed upon and established fees.

6        3.6    Based on the Service Agreements, the course of dealings between ServiceLink

7    and RTSC, and industry customs and practice, ServiceLink would invoice RTSC for its fees

8    for the title and ancillary foreclosure services.  In turn, RTSC included ServiceLink's fees on

9    RTSC invoices to its customers as reimbursable expenses arising from the foreclosure

10   process.  RTSC would then receive payment on the invoices from its customers, including

11   funds earmarked for reimbursable expenses payable to ServiceLink as the service provider.

12   RTSC customarily received payment on its invoices from customers either at the completion

13   of the foreclosure process, or, if applicable, at two different intervals: the time of interim

14   billing and at the completion of the foreclosure process.

15       3.7    Based on the terms of the Service Agreements, the course of dealings between

16   ServiceLink and RTSC, and industry customs and practice, the reimbursable expenses

17   received by RTSC were earmarked for ServiceLink and intended to be held for the sole use

18   and benefit of ServiceLink, who had a legal right to immediate payment of those monies upon

19   receipt by RTSC.

20       3.8    The monies paid to RTSC as reimbursable expenses for ServiceLink's fees

21   were not intended for the benefit and use of RTSC, or RTSC's officers, directors, and

22   shareholders, as neither those individuals, nor RTSC had a beneficial interest, right or claim

23   of title in the monies received for reimbursable expenses.

24       3.9    Beginning in 2008, RTSC began to fail to pay or turn over monies received as

25   reimbursable expenses for ServiceLink's services.  By July of 2014, the balance owed had

26   grown to $4,952,930.14.

COMPLAINT – 4

**B.**   **Attempt to Avoid Payment to ServiceLink through RTSC Asset Sale and Receivership Proceeding**

3.10   During June of 2014, RTS Pacific was formed as a corporation under the laws of the State of Washington.  Upon information and belief, RTSC was insolvent at the time of the formation of RTS Pacific.

3.11   On July 16, 2014, Rebhuhn, as President and owner of fifty-one percent (51%) of RTSC, and Lavandier, as owner of forty-nine percent (49%) of RTSC, for their own benefit and that of their respective martial community, entered into an asset purchase agreement (the "Purchase Agreement") on behalf of RTSC with Cypress Innovations Inc., ("Cypress"), a Nevada corporation, and its affiliate and intended assignee, RTS Pacific.  A true and correct partial copy of the Purchase Agreement, excluding certain schedules and exhibits referenced therein, is attached hereto as **Exhibit A**.

3.12   Pursuant to the Purchase Agreement, RTSC transferred substantially all of its assets to Cypress in exchange for an unsecured promissory note in the principal amount equaling the sum of 75% of the value of RTSC's current accounts receivable (the amount Cypress represented a factor would immediately pay for the accounts) plus $50,000 for certain equipment and other assets (the "Cypress Note").  In addition, RTSC received an executed employment agreement for Rebhuhn, who assumed the role of President and Director of RTS Pacific.  In exchange for the Cypress Note, Cypress received all of RTSC's future billings for work in progress on more than 4,050 active foreclosure files, all of RTSC's accounts receivable, and all future billings on RTSC's more than 4,050 active foreclosure files, with the exception of certain files and accounts relating to services provided in Oregon.

3.13   Upon information and belief, Cypress assigned all of the assets acquired through the Purchase Agreement to RTS Pacific.

3.14   Upon information and belief, the outstanding accounts receivable assigned to Cypress and/or RTS Pacific under the Purchase Agreement included pass-through expenses

COMPLAINT – 5

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

SER004-0001 2849113.docx

1  for title, publication, posting and ancillary foreclosure services performed by ServiceLink in

2  relation to the Service Agreements.

3       3.15   On July 23, 2014, RTSC entered into an amendment to the Purchase

4  Agreement with Cypress (the "Amendment") in order to provide operating capital to RTS

5  Pacific, who could not obtain desired financing.   According to the Amendment, RTSC

6  transferred $150,000 in capital to RTS Pacific in exchange for a promissory note of $150,000

7  with a fixed interest rate of seven percent (7%) per annum (the "RTS Pacific Note").

8       3.16   On August 5, 2014, RTSC filed a petition for receivership in King County

9  Superior Court (the "Petition").   The Petition listed RTSC's assets as including $30,118.68 in

10  cash, $139,697.85 in accounts receivable, the Cypress Note, valued at $976,855.07, and the

11  RTS Pacific Note for $150,000.   The Court appointed a general receiver to administer all of

12  RTSC's assets.   A true and correct copy of the Petition is attached hereto as **Exhibit B**.

13       3.17   Upon information and belief, and as revealed by the receivership schedules, the

14  amounts collected from customers by RTSC and earmarked as reimbursable expenses for

15  services provided by ServiceLink were no longer in the possession of RTSC at the time of the

16  Asset Purchase or the filing of the Petition.

17  **C.**    **Misuse/Misappropriation of Funds Earmarked for ServiceLink**

18       3.18   Upon information and belief, before the Purchase Agreement and filing of the

19  Petition, Rebhuhn and Lavandier took possession, misappropriated and/or directed

20  reimbursable expenses earmarked for ServiceLink for their own personal use and benefit and

21  for the benefit of their martial communities.

22       3.19   Upon information and belief, prior to the closing of the Purchase Agreement,

23  Rebhuhn and Lavandier had knowledge of the Service Agreements and the amounts owed to

24  ServiceLink by RTSC for services provided.

25       3.20   Upon information and belief, Rebhuhn and Lavandier knew accounts

26  receivable sold to RTS Pacific included amounts to be paid and held in trust for ServiceLink,

COMPLAINT – 6

1  yet sold the accounts receivable, while purporting to retain liability, knowing the Petition was

2  imminent and would further hinder and delay the ability of ServiceLink to collect.

3      3.21    Upon information and belief, the Purchase Agreement and receivership were

4  concerted efforts by Rebhuhn and Lavandier to shield themselves from liability for funds

5  misappropriated for their own use and benefit, and to avoid payment of the monies owed to

6  ServiceLink, in breach of the Service Agreements.

7      3.22    A total balance of $4,952,930.14 in fees, excluding interest, remains

8  outstanding for title, publication and posting services ServiceLink provided to RTSC.

9          **IV.    FIRST CAUSE OF ACTION: Constructive Trust**

10     4.1    ServiceLink incorporates by reference the allegations of Paragraphs 1.1

11 through 3.22 as if fully set forth herein.

12     4.2    RTSC received monies from customers as reimbursable expenses for

13 ServiceLink's services that were intended to be held for ServiceLink's use and benefit and

14 promptly turned over to ServiceLink for payment of the services it provided.

15     4.3    ServiceLink was entitled to receive, and had a legal right and title in, the

16 monies that were received by RTSC from customers for ServiceLink's services.

17     4.4    Upon information and belief, Defendants misappropriated and/or directed the

18 reimbursable expenses earmarked for ServiceLink elsewhere, for Defendants' personal use

19 and benefit and the benefit of their respective marital communities.

20     4.5    Upon information and belief, Defendants were unjustly enriched when the

21 monies paid by customers as reimbursable expenses for ServiceLink's performance came into

22 their possession or control, or into the possession and control of others for their benefit.

23     4.6    When monies were wrongfully detained, a constructive trust was created.

24     4.7    Defendants' misappropriation and direction of funds earmarked for the

25 payment of ServiceLink's fees was wrongful and in derogation of ServiceLink's right in and

26 title to those monies, and constituted a breach of the constructive trust.

COMPLAINT – 7

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

SER004-0001 2849113.docx

4.8    Defendants are required to return those monies in an amount not less than $4,952,930.14, or if Defendant dissipated the monies, ServiceLink is entitled to a money judgment for that amount, plus interest, against Defendants.

## V.    SECOND CAUSE OF ACTION: Conversion

5.1    ServiceLink incorporates by reference the allegations of Paragraphs 1.1 through 4.8 as if fully set forth herein.

5.2    RTSC invoiced customers for title, publication, posting and ancillary foreclosure services rendered by ServiceLink under the Service Agreements.

5.3    RTSC received monies from customers that were intended to be held for the use and benefit of ServiceLink and promptly turned over to ServiceLink as payment for services provided.

5.4    ServiceLink had a legal right and title in the monies paid to RTSC by customers for the services provided by ServiceLink.

5.5    Pursuant to the Service Agreements, ServiceLink had the right to the immediate turnover of the monies paid by customers to RTSC for the services provided by ServiceLink.

5.6    Defendants, who controlled RTSC, did not apply the monies received from customers to the amounts due to ServiceLink. Upon information and belief, Defendants directed these monies elsewhere, for Defendants' own personal use and benefit and the benefit of their respective marital communities.

5.7    Defendants' withholding and misappropriation of, and exertion of dominion over, the monies received by RTSC that were due to ServiceLink constituted a wrongful conversion of ServiceLink's monies.

5.8    ServiceLink has suffered a loss exceeding $4,952,930.14 as a result of Defendants' conversion.

COMPLAINT – 8

## VI.   THIRD CAUSE OF ACTION:
### Intentional Interference with a Business Expectancy

6.1   ServiceLink incorporates by reference the allegations of Paragraphs 1.1 through 5.8 as if fully set forth herein.

6.2   At the time of the Purchase Agreement, Defendants knew that ServiceLink had a valid and ongoing contractual relationship with RTSC.

6.3   Defendants knew, or should have known, that ServiceLink reasonably expected payment of the outstanding invoiced charges owed to ServiceLink by RTSC for the performance of services in relation to the Service Agreements.

6.4   Defendants wrongfully directed or misappropriated the monies paid by RTSC customers for the services provided by ServiceLink.

6.5   Defendants' intentional acts caused the nonpayment of the amounts owed to ServiceLink by RTSC for the services provided under the Service Agreements.   The nonpayment constituted a material breach of the Service Agreements and disrupted ServiceLink's reasonable expectation of payment.

6.6   As a result of Defendants' intentional plan and acts, ServiceLink has suffered damages in an amount exceeding $4,952,930.14, exclusive of costs and interest.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.   Judgment against Defendants Chris Rebhuhn individually, and his marital community, and Aleta Lavandier individually, and her martial community, and in favor of ServiceLink in an amount not less than $4,952,930.14, together with pre-judgment and post-judgment interest at the statutory rate;

2.   An award of Plaintiffs' costs and disbursements herein, including reasonable attorneys' fees;

3.   Additional damages proven at the time of trial; and

4.   Such other and further relief as the Court deems just and equitable.

COMPLAINT – 9

1

DATED this 6th day of February, 2015.

2

3                                              CARNEY BADLEY SPELLMAN, P.S.

4                                                _s/ Jason M. Kettrick_
                                               Jason M. Kettrick, WSBA #35459
5                                              Elliot C. Copenhaver, WSBA #46909
6                                              701 Fifth Avenue, Suite 3600
                                               Seattle, WA 98104
7                                              Phone:  (206) 622-8020
                                               Facsimile:  (206) 467-8215
8                                              kettrick@carneylaw.com
                                               copenhaver@carneylaw.com
9

10                                             Of Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT – 10

SER004-0001 2849113.docx

# EXHIBIT A

# TABLE OF CONTENTS

Page

ARTICLE I SALE AND PURCHASE OF THE ASSETS ............................................. 2

    1.1    Defined Terms. ........................................................................ 2
    1.2    Sale and Purchase. ................................................................. 7
    1.3    Payment of the Purchase Price. ........................................... 7
    1.4    Offset. ...................................................................................... 7

ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE COMPANY .................. 8

    2.1    Due Organization and Qualification. ................................... 8
    2.2    Subsidiaries. ........................................................................... 8
    2.3    Due Authorization. ................................................................ 8
    2.4    Liens. ........................................................................................ 8
    2.5    Non-Contravention. . ............................................................. 8
    2.6    Absence of Changes or Events. ........................................... 9
    2.7    Personal Property. . .............................................................. 10
    2.8    Compliance with Licenses, Permits, Laws and Other Instruments. ............. 11
    2.9    Contracts and Agreements. ................................................. 11
    2.10    Employment Contracts and Employee Plans. .................. 12
    2.11    Employee Benefits.  Employee Benefits. ......................... 13
    2.12    Labor Disputes; Compliance. ............................................. 15
    2.13    OSHA. ...................................................................................... 15
    2.14    Claims and Proceedings. ..................................................... 16
    2.15    Taxes. ...................................................................................... 16
    2.16    Real Properties; Leases. ...................................................... 17
    2.17    Insurance; Professional Liability/Errors and Omissions. ............. 17
    2.18    Books and Records. .............................................................. 18
    2.19    Financial Statements. ........................................................... 18
    2.20    Accounts Receivable. .. ........................................................ 18
    2.21    Accounts Payable. ................................................................ 19
    2.22    Bank Accounts. ...................................................................... 19
    2.23    Environmental Matters. ....................................................... 19
    2.24    Intellectual Property. ........................................................... 20
    2.25    Brokers. ................................................................................... 20
    2.26    Illegal Payments; FCPA. ..................................................... 21
    2.27    Related Party. . ...................................................................... 21
    2.28    Active Files and WIP. .......................................................... 21
    2.29    States in Which Doing Business. ......................................... 22
    2.30    Intentionally Deleted. .......................................................... 22
    2.31    Information Furnished. . ....................................................... 22

ARTICLE III BUYER'S REPRESENTATIONS AND WARRANTIES..................................22

    3.1    Due Organization.. ............................................................................22
    3.2    Due Authorization.. ...........................................................................22
    3.3    No Brokers. .......................................................................................22

ARTICLE IV COVENANTS ..................................................................................22

    4.1    Conduct of Business Pending Closing.:................................................22
    4.2    Consents of Others............................................................................24
    4.3    Notification of Certain Matters. ........................................................25
    4.4    Further Assurances...........................................................................25
    4.5    Access to Records Before Closing......................................................25
    4.6    Disclosure Schedules. .......................................................................25

ARTICLE V CONDITIONS TO OBLIGATION OF PARTIES TO CONSUMMATE
                CLOSING ......................................................................................25

    5.1    Conditions to Buyer's Obligations.. ...................................................25
    5.2    Conditions to the Company's Obligations..........................................27

ARTICLE VI CLOSING .......................................................................................28

    6.1    Closing.............................................................................................28
    6.2    Documents to be Delivered by the Company .....................................28
    6.3    Obligations of Buyer.........................................................................30
    6.4    Prorations. .......................................................................................30

ARTICLE VII TAXES ........................................................................................31

    7.1    Transfer Taxes.. ...............................................................................31
    7.2    Tax Matters. ....................................................................................31

ARTICLE VIII INDEMNIFICATION.....................................................................31

    8.1    Survival............................................................................................31
    8.2    Indemnification..................................................................................31
    8.3    Limitations on Indemnification Obligations of Sellers........................32
    8.4    Non-Exclusive Remedy.....................................................................34

ARTICLE IX POST-CLOSING MATTERS ...................................................... 34

9.1      Confidential Information. ................................................................ 34
9.2      Noncompetition. ............................................................................. 34
9.3      Authority Filings and Notifications. ................................................ 36
9.4      Accounts Receivable received by Sellers on or after Closing. ........ 36

ARTICLE X TERMINATION ............................................................................ 36

10.1     Termination of Agreement. ............................................................ 36
10.2     Effect of Termination. .................................................................... 36

ARTICLE XI MISCELLANEOUS ...................................................................... 37

11.1     Modifications; Waiver. .................................................................. 37
11.2     Notices. ......................................................................................... 37
11.3     Counterparts. ................................................................................ 39
11.4     Binding Effect; Assignment; No Third Party Rights. .................... 39
11.5     Reserved. ....................................................................................... 40
11.6     No Strict Construction. ................................................................. 40
11.7     Entire and Sole Agreement. .......................................................... 40
11.8     Governing Law; Jurisdiction and Venue. ...................................... 40
11.9     Invalid Provisions. ........................................................................ 40
11.10    Headings. ......................................................................................... 1

List of Exhibits and Schedules

Exhibits
| | |
|---|---|
| Exhibit A-1 | Assets |
| Exhibit A-2 | Excluded Assets |
| Exhibit A-3 | Assumed Liabilities |
| Exhibit A-4 | Promissory Note, as amended pursuant to Section 5.1(i) |
| Exhibit A-5 | 1060 Allocation |
| Exhibit A-6 | Accounts Receivable, as amended from time to time pursuant to Section 5.1(i) |
| Exhibit A-7 | WIP, as amended from time to time pursuant to Section 5.1(i) |
| Exhibit B | Intentionally Deleted |
| Exhibit C | Chris Rebhuhn Employment Agreement |
| Exhibit D | Kaufman Employment Agreement |
| Exhibit E | Lease Amendment |
| Exhibit F | Tech Amendment |
| Exhibit G | Officer's Certificate |
| Exhibit H | Intentionally Deleted |
| Exhibit I | Form of Bill of Sale |
| Exhibit J | Form of Assignment and Assumption of Assumed Liabilities |
| Exhibit K | Form of Assignment and Assumption of Intangible Property |
| Exhibit L | Joint Disclosure |

Schedules
| | |
|---|---|
| Schedule 2.5 | Non-Contravention |
| Schedule 2.6 | Changes or Events Since December 31, 2013 |
| Schedule 2.7 | Personal Property Liens |
| Schedule 2.8(a) | Licenses and Permits |
| Schedule 2.9 | Material Contracts |
| Schedule 2.10(a) | List of Employees |
| Schedule 2.10(c) | Terminated Employees |
| Schedule 2.10(d) | Employee Agreements |
| Schedule 2.11(a) | Employee Benefit Plans |
| Schedule 2.11(g) | Post-Retirement Welfare Plans |
| Schedule 2.11(k) | Benefits Triggered by the Transaction |
| Schedule 2.13(b) | OSHA Notices |
| Schedule 2.14 | Claims and Proceedings |
| Schedule 2.15(a) | Tax Returns and Withholdings |
| Schedule 2.15(b) | Withholdings |
| Schedule 2.15(c) | Tax Assessments |
| Schedule 2.16(a) | Leases |
| Schedule 2.17 | Insurance |
| Schedule 2.19 | Financial Statements |
| Schedule 2.20 | Accounts Receivable |

Schedule 2.21        Accounts Payable
Schedule 2.22        Bank Accounts
Schedule 2.24(a)     Intellectual Property
Schedule 2.24(b)     License Agreements
Schedule 2.25        Brokers
Schedule 2.27        Related Party Transactions
Schedule 5.1(b)      Consents

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into effective as of July 16, 2014 by and among Cypress Innovations, Inc., a Nevada corporation or its affiliated assignee (the "Buyer"), Regional Trustee Services Corporation, a Washington corporation ("RTSC"), Regional Service Corporation, a California corporation ("RSC", together with RTSC, collectively, the "Company" or the "Sellers").

## RECITALS

WHEREAS, the Company is engaged in providing trustee services in many western states, as follows (the "Business"):  (a)  RTSC is a Washington corporation qualified to do business in Oregon and doing business in Alaska by the filing of a bond with the state, formerly known as Washington Trustee Services Corporation and as Interstate Trustee Services Corporation, (b) RSC is a California corporation qualified to do business in Nevada; (c) RTSC has filed a Q Sub election and has filed all federal tax returns for RSC under RTSC; and (d) the Company does business in additional western states by the following methods:  (1)  title agency agreements for the States of Idaho and Montana with RTSC, and (2) Debbie Kaufman and Chris' insurance licenses in Arizona.  RTSC has an escrow license and affiliated bond in Oregon which is not being transferred to Buyer.

WHEREAS, Chris Rebhuhn ("Chris"), Aleta Lavandier ("Aleta") own all of the issued and outstanding shares of capital stock of RTSC, specifically, Aleta owns 8,496 shares of common stock and Chris owns 8,843 shares of common stock  of RTSC and Chris and Aleta own all of the issued and outstanding shares of capital stock of RSC, specifically, Aleta owns 490 shares of common stock and Chris owns 510 shares of common stock of RSC, (collectively, the "Shares) and as such, have the authority to sell the Assets and assign the Assumed Liabilities as defined below;

WHEREAS, Chris and Aleta are each married.  Aleta is married to Nicholas J. Lavandier and  Chris is married to Meredith Rebhuhn, and each of Chris and Aleta shall cause his or her spouse to waive any rights to object or approve or overturn this transaction under community property laws or otherwise by Joinder below;

WHEREAS, in addition to the conditions precedent and other delivery conditions, Buyer's obligations hereunder are strictly contingent on Accounts Receivable being at least $1 million (with no credits owing to any customers), all aged less than 90 days from the date of invoice and a minimum of 4,050 Active Files.

WHEREAS, certain terms used in this Agreement are defined in Article 1 hereof.

NOW,  THEREFORE,  in  consideration  of  the  foregoing  and  of  the  mutual representations, warranties, covenants, agreements, terms and conditions set forth below, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I
## SALE AND PURCHASE OF THE ASSETS

1.1     **Defined Terms.** As used in this Agreement, the following terms have the meanings set forth below:

"1060 Allocation" is as defined in Section 1.2 and on Exhibit "A-5".

"Accountant" means *Cross, Fernandez & Riley LLP* or such other mutually agreeable national or regionally recognized accounting.

"Accounts Receivable" has the meaning set forth in Section 2.20 hereof including all accounts receivable including but not limited to those set forth on Exhibit A-6, as updated from time to time.

"Active Files" has the meaning set forth in Section 2.28 hereof.

"Agreement" has the meaning set forth in the Preamble hereof.

"Affiliate" means, with respect to any Person, (a) a manager, director, officer or shareholder of such Person, (b) a spouse, parent, sibling or descendant of such Person (or a spouse, parent, sibling or descendant of any director or officer of such Person) and (c) any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person.

"Assets" has the meaning set forth herein and in Exhibit A-1.

"Assumed Liabilities" has the meaning set forth herein and in Exhibit A-3.

"Business" has the meaning set forth in the Recitals hereof.

"Buyer" has the meaning set forth in the Recitals hereof.

"Buyer Indemnified Parties" has the meaning set forth in Section 8.2(a) hereof.

"Buyer Indemnifiable Costs" has the meaning set forth in Section 8.2(a) hereof.

"Buyer Returns" has the meaning set forth in Section 7.2(c) hereof.

"Claims or Proceedings" has the meaning set forth in Section 2.14 hereof.

"Claim Certificate" has the meaning set forth in Section 9.3(d)(i) hereof.

"Closing" has the meaning set forth in Section 6.1 hereof.

"Closing Date" has the meaning set forth in Section 6.1 hereof.

"Closing Payment" has the meaning set forth in Section 1.4(f) hereof.

2

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the preamble hereof.

"Confidential Information" has the meaning set forth in Section 9.1 hereof.

"Deductible" has the meaning set forth in Section 8.3(a) hereof.

"Effective Time" has the meaning set forth in Section 6.1 hereof.

"Employee Plans" has the meaning set forth in Section 2.11(a) hereof.

"Environmental Laws" means any and all applicable federal, state, local, municipal or foreign laws, rules, orders, regulations, statutes, ordinances, codes or requirements of any Governmental Authority concerning air, water, solid waste, Hazardous Substance, chemical or release reporting worker and community right-to-know, hazard communication, noise, natural resources, species protection, resource protection, zoning, wetlands and watercourses, health protection or other environmental, health, safety, building and land use concerns as may now or at any time hereafter be in effect.

"Entity" shall mean any Person other than an individual or a Governmental Authority.

"ERISA" has the meaning set forth in Section 2.11(a) hereof.

"ERISA Affiliate" has the meaning set forth in Section 2.11(a) hereof.

"Estimated Statement of Accounts" has the meaning set forth in Section 1.5(a) hereof.

"Estimated Statement of Working Capital" has the meaning set forth in Section 1.5(a) hereof.

"Estimated Statements" has the meaning set forth in Section 1.5(a) hereof.

"Excluded Assets" has the meaning set forth herein and in Exhibit A-2.

"Final Adjustment Amount" has the meaning set forth in Section 1.5(f) hereof.

"Final Statement" has the meaning set forth in Section 1.5(e) hereof.

"Financial Statements" has the meaning set forth in Section 2.19 hereof.

"Form 5500 Expenses" has the meaning set forth in Section 5.1(m) hereof.

"Fundamental Representations" has the meaning set forth in Section 8.3(a) hereof.

"GAAP" means United States generally accepted accounting principles consistently applied.

3

"Governing Documents" means the (i) certificate of formation, certificate of incorporation or articles of incorporation, as applicable, under which an Entity is formed; and (ii) the other documents or agreements, including bylaws of a corporation or operating agreements of limited liability companies, or similar documents, adopted by the Entity to govern the formation and internal affairs of the Entity.

"Governmental Authority" means any government, any governmental or regulatory entity or body, department, commission, board, agency or instrumentality, and any court, tribunal or judicial body, in each case whether federal, state, county, provincial, and whether local or foreign.

"Hazardous Substance" means any substance, material or waste that is regulated by or forms the basis of liability now or hereafter under any Environmental Laws, including without limitation any material or substance that is (a) defined as a "solid waste," "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "pollutant," "contaminant," "hazardous constituent," "special waste," "toxic substance" or other similar term or phrase under any Environmental Law, and (b) petroleum or any fraction or by-product thereof, asbestos-containing material, mold, radioactive material, biomedical waste, infectious material, polychlorinated biphenyls (PCB's), or any radioactive substance.

"Indebtedness" means and include all Liabilities and obligations, including any applicable fees, penalties (including with respect to any prepayment thereof), interest and premiums: (i) for borrowed money; (ii) evidenced by notes, bonds, debentures or similar instruments; (iii) for the deferred purchase price of goods or services (other than trade payables or accruals incurred in the ordinary course of business); (iv) under capital leases; (v) all accounts payable and all accrued expenses or liabilities (excluding accounts payable and other accrued liabilities from time to time incurred in the ordinary course of business that are within their stated terms and are not delinquent); and (vi) in the nature of guarantees of the obligations described in clauses (i) through (v) above.

"Indemnified Party" has the meaning set forth in Section 8.3(d)(i) hereof.

"Indemnifying Party" has the meaning set forth in Section 8.3(d)(i) hereof.

"Intellectual Property" has the meaning set forth in Section 2.24(a) hereof.

"Interim Financial Statements" has the meaning set forth in Section 2.19 hereof.

"Inventories" has the meaning set forth in Section 2.7(c) hereof.

"IRS" means the United States Internal Revenue Service.

"Knowledge" means actual knowledge and such knowledge which should have been acquired by such Person after making such due inquiry and exercising such due diligence as a prudent businessperson would have made or exercised in the management of his or her business affairs. Statements as to the Knowledge of the Company shall include the Knowledge of each Chris or Aleta.

4

"Laws" means any non-U.S. law applicable to the Business, U.S. federal, state or local law, statute, rule, regulation, administrative ruling, order or process (including any rule, regulation, law, airworthiness directive, mandatory service bulletin, or equivalent of any Governmental Authority, zoning or land use law, building code, environmental law, securities, stock exchange, blue sky, civil rights, employment, labor or occupational health and safety law or regulation or any law, order, rule or regulation applicable to federal contractors or subcontractors at any tier).

"Lease Amendment" means the lease amendment in the form attached to this Agreement as Exhibit E.

"Leases" has the meaning set forth in Section 2.16(a) hereof.

"Leased Real Property" has the meaning set forth in Section 2.16(b) hereof.

"Liability" or "Liabilities" means, with respect to any Person, all liabilities of any kind (whether contingent, accrued, due or to become due, secured or unsecured, matured or otherwise), including but not limited to accounts payable, royalties payable, and other reserves, Taxes, accrued bonuses, accrued vacation, employee expense obligations and all other liabilities of such Person, regardless of whether such liabilities are required to be reflected on a balance sheet in accordance with GAAP. Liabilities shall not include third-party accounts payable, except such accounts payable that have not been paid in accordance with vendor terms.

"Lien" has the meaning set forth in Section 2.7(a) hereof.

"Material Adverse Change" and "Material Adverse Effect" means, with respect to any Person, (i) any material adverse change in the business, operations, assets, condition (financial or otherwise), operating results, liabilities or prospects of such Person, (ii) any material casualty loss or damage to the assets of such Person, whether or not covered by insurance, or (iii) any material adverse change in relations with employees, customers, suppliers, or any Governmental Authority.

"Material Contracts" has the meaning set forth in Section 2.9 hereof.

"Notice of Objection" has the meaning set forth in Section 1.5(c) hereof.

"Order" means temporary restraining order, preliminary or permanent injunction or other order of a court of competent jurisdiction or any other Governmental Authority.

"OSHA" means the Occupational Safety and Health Administration and any State that administers its own OSHA-approved State Implementation Plan.

"Permit" means all licenses, permits, certificates, approvals, consents and other authorizations that the Company owns, holds or possesses from any source.

"Person" means an individual or entity, including a partnership, limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a Governmental Entity.

"Personal Property Leases" has the meaning set forth in Section 2.16(a) hereof.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and, for purposes of Section 7.2(e), with respect to any taxable years or periods beginning before and ending after the Closing Date, the portion of such taxable years or period ending on and including the Closing Date.

"Promissory Note" has the meaning set forth in Section 1.3 hereof and on Exhibit A-4.

"Purchase Price" has the meaning set forth in Section 1.3 hereof.

"Real Property Leases" has the meaning set forth in Section 2.16(a) hereof.

"Related Agreements" means this Agreement and all agreements referenced and/or incorporated herein.

"Related Party" has the meaning set forth in Section 2.27 hereof.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller Indemnifiable Costs" has the meaning set forth in Section 8.2(b) hereof.

"Seller Indemnified Parties" has the meaning set forth in Section 8.2(b) hereof.

"Seller Representative" has the meaning set forth in Section 11.5(a) hereof.

"Seller Returns" has the meaning set forth in Section 7.2(c) hereof.

"Sellers" has the meaning set forth in the preamble hereof.

"Shares" has the meaning set forth in the Recitals hereof.

"Tax" or "Taxes" means (i) any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions and liabilities, including taxes based upon or measured by gross receipts, gross margin, income, profits, sales, use and occupation, and value added, ad valorem, escheat, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes as well as public imposts, fees and social security charges (including but not limited to health, unemployment, workers' compensation and pension insurance), together with all interest, penalties and additions imposed with respect to such amounts, (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group (including any arrangement for group or consortium relief or similar arrangement) for any period, and (iii) any liability for the payment of any amounts of the type described in clauses (i) or (ii) as a result of any express or implied obligation to indemnify any other person or as a result of any obligation under any agreement or arrangement with any other person with respect to such amounts.

"Tax Returns" means all returns, reports, forms, declarations, claims for refund,

6

information returns or statements or information related to any Tax, including any schedule or attachment thereto, and including any amendment thereof.

"Tech Amendment" means the tech amendment in the form attached to this Agreement as Exhibit F.

"Transaction" has the meaning set forth in the Recitals hereof.

"Trust Accounts" has the meaning set forth in Section 2.22 hereof.

"UCC" has the meaning set forth in Section 5.1(f) hereof.

"WARN Act" has the meaning set forth in Section 2.10(e) hereof.

"WIP" has the meaning set forth in Section 2.28 hereof and as set forth on Exhibit A-7 as updated from time to time.

1.2    **Sale and Purchase.** At the Closing, as hereinafter defined, Seller shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase or assume, as applicable, from Seller the following: the Assets as further set forth on Exhibit A-1. The Assets shall be transferred to Buyer at Closing free and clear of any and all liens, claims, encumbrances, pledges, mortgages and security interests and shall not include the Excluded Assets set forth on Exhibit A-2. Buyer shall not assume any of Seller's obligations, debts or liabilities as a result of the purchase of the Assets, except as set forth in writing herein, as Assumed Liabilities on Exhibit A-3.

1.3    **Payment of the Purchase Price.** Subject to Section 5.1(i), the purchase price ("Purchase Price") for the Assets as valued with the assumption of the Assumed Liabilities will be an amount equal to seventy-five percent (75%), which is the amount financeable, of the value of the Accounts Receivable as of Closing that is aged less than ninety (90) days from the invoice date with no adjustment for credits due customers plus equipment and other Assets valued at $50,000, such sum will be rolled into a Promissory Note in the form of Exhibit "A-4" ("Promissory Note"). Sellers and Buyer hereby acknowledge that for financing puurposes only, the amount financeable was computed as of July 10, 2014, at $1,025,228.92 (which excludes $17,032.54, which are Accounts Receivable owed by an affiliate of Buyer, Cal-Western, for which Cal-Western will be paying before Closing to Sellers. The Promissory Note will be for five years at a four percent (4%) interest rate, payable in monthly installments of principal and interest.   The 1060 Allocation for the Assets shall be as set forth on Exhibit A-5 ("1060 Allocation").   Each party hereto agrees (i) that any such allocation shall be consistent with the requirements of Section 1060 of the Code, (ii) to complete jointly and to file separately Form 8594 with its Federal income Tax Return consistent with such allocation for the Tax year in which the Closing Date occurs, and (iii) that no party will take a position on any income, transfer or gains Tax Return, before any Regulatory Authority charged with the collection of any such Tax or in any judicial proceeding, that is in any manner inconsistent with the terms of any such allocation without the consent of the other party.

1.4    **Offset.** To the extent that a representation, warranty or covenant is false under the definitive Agreement, then Buyer shall be entitled to offset the amounts payable under the

Promissory Note and/or seek repayment from Sellers on a dollar for dollar basis (together with attorneys' fees and costs) for the claims or losses as a result of such false representation, warranty or covenant, except for ordinary course litigation related to trustee services completed in a good and competent manner.

**ARTICLE II**

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

The Company represents and warrants to Buyer that as of the date hereof and of Closing:

**2.1    Due Organization and Qualification.**

(a)    RTSC is a corporation duly organized and validly existing under the laws of the State of Washington and has full corporate power and authority to own its properties and to carry on the Business as presently conducted. The Company is qualified to do business in each jurisdiction in which the nature of the Business or the ownership of its properties requires such qualification. RTSC filed an S election but a copy cannot be located. RTSC has operated for at least 14 years under the EIN 91-1395909 and not the EIN of Interstate Trustee Services Corporation #86-0492674. RTSC has not filed a Q sub election.

(b)    RSC is a corporation duly organized, validly existing, and in good standing under the laws of the State of California and has full corporate power and authority to own its properties and to carry on the Business as presently conducted. The Company is qualified to do business in each jurisdiction in which the nature of the Business or the ownership of its properties requires such qualification. RSC has no EIN or S election.

**2.2    Subsidiaries.** The Company has no subsidiaries and does not conduct any operations, business, or activities other than operation of the Business at the Leased Real Property.

**2.3    Due Authorization.** The Company has all necessary corporate power and has taken all necessary corporate action to authorize, execute, deliver and perform this Agreement and the Related Agreements, to consummate the transactions contemplated by this Agreement and the Related Agreements and for the assignment and delivery of the Assets and assignment of the Assumed Liabilities. This Agreement and the Related Agreements have been duly executed and delivered by the Company, and constitute the valid and legally binding obligation of each, enforceable against each in accordance with its terms and conditions, subject, as to enforcement, to bankruptcy, insolvency, fraudulent conveyance, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equitable principles.

**2.4    Liens.** There are no Liens or UCC Financing Statements filed against any of the Assets.

**2.5    Non-Contravention.** The execution, delivery, and performance of this Agreement (as well as the Related Agreements and all other instruments, agreements, certificates, or other documents contemplated hereby) by the Company and the consummation of the transactions contemplated by this Agreement and the Related Agreements do not and will not (a) violate or conflict with any Laws, any Permit, or any Order applicable to the Company, or its assets or properties, (b) violate or conflict with any of the Governing Documents of the Company, (c) violate or conflict with, or permit the cancellation of, trigger or create any right or constitute a

8

default under any agreement to which the Company is a party, which is material to the Business, or by which it or any of its properties are bound, (d) result in the imposition of any Lien upon any of the assets of the Company, or (e) violate, conflict with, impair, result in the cancellation, suspension, or restriction of, or otherwise have any Material Adverse Effect upon, any Permits, or alter the Company's or Buyer's ability to operate the Business from and after the Closing Date in a way that is materially different from the way the Company operated the Business just before the Closing Date. Except as set forth on Schedule 2.5, the Company is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval from any Governmental Authority or give any notice to, or obtain any consent or approval from, any other Person, in order for the Company to consummate the transactions contemplated by this Agreement or any Related Agreement, or for the Company and Buyer's to operate the Business in the ordinary course following the Closing Date, or to operate the Business from and after the Closing Date in the same way as the Company operated the Business just before the Closing Date.

2.6    **Absence of Changes or Events.** Since December 31, 2013, the Company has operated the Business in the ordinary course consistent with past practices, and the Company, taken as a whole, has suffered no Material Adverse Change. Except as set forth on Schedule 2.6, since December 31, 2013, the Company has not:

(a)    acquired (including, without limitation, by merger, consolidation, or acquisition of stock or assets or any other business combination) or any division of any such Entity or any significant amount of assets;

(b)    issued, delivered, sold or authorized, or proposed the issuance, delivery or sale of, any capital stock of the Company or securities convertible into, or subscriptions, rights, warrants or options to acquire, or other agreements or commitments of any character obligating the Company to issue any such capital stock or other convertible securities;

(c)    incurred any Indebtedness or issued any debt securities or assumed, guaranteed or endorsed, or otherwise become responsible for, the obligations of any person, or made any loans or advances, or granted any security interest in any of its assets, except in the ordinary course of business and consistent with past practice;

(d)    entered into any contract or agreement;

(e)    authorized or made any commitment that is not shown on the balance sheet contained in the Interim Financial Statements with respect to any single capital expenditure which is in excess of $25,000 or capital expenditures which are, in the aggregate, in excess of $50,000;

(f)    increased the compensation payable or to become payable or the benefits provided to its managers, officers or employees, except for increases in the ordinary course of business and consistent with past practice in salaries, wages, bonuses, incentives or benefits of employees of the Company, or granted any severance or termination pay to, or entered into any employment or severance agreement with, any manager/director, officer or other employee of the Company, or established, adopted, entered into or amended any collective bargaining, bonus,

9

profit-sharing, thrift, compensation, stock option, restricted stock, pension, retirement, deferred compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any manager/director, officer or employee;

(g)     taken any action, other than reasonable and usual actions in the ordinary course of business and consistent with past practice, with respect to accounting policies or procedures;

(h)     made any Tax election or settled or compromised any United States federal, state, local or non-United States income Tax Liability or changed any method of accounting for Tax purposes; filed any Tax Return other than on a basis consistent with past practice; filed any amended Tax Return; consented to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes; filed any material claim for refund of Taxes previously paid or surrender of any claim for refund;

.  (i)     paid, discharged or satisfied any material claim, Liability or obligation (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction, in the ordinary course of business and consistent with past practice;

(j)     amended, modified or consented to the termination of any Material Contract, or amended, waived, modified or consented to the termination of any material rights of any party to such Material Contract, other than in the ordinary course of business and consistent with past practice;

(k)     commenced, became the subject of, or settled any litigation, suit, claim, action, investigation or proceeding;

(l)     permitted any material item of Intellectual Property to lapse or to be abandoned, dedicated, or disclaimed, failed to perform or make any material filings, recordings or other similar actions or filings applicable to the Intellectual Property, or failed to pay any and all fees and Taxes required to maintain and protect its interest in each and every item of Intellectual Property;

(m)     permitted any of the Governmental Authorizations to lapse or to be abandoned, dedicated, or disclaimed, failed to perform or make any material filings, recordings, or similar actions or filings applicable to any of the Governmental Authorizations, or failed to pay any and all fees, fines and Taxes required to maintain and protect its interest in each and every of the Governmental Authorizations; or

(n)     announced an intention, entered into any formal or informal agreement or otherwise made a commitment, to do any of the foregoing.

2.7     **Personal Property.**  The Company has good title to (or valid leasehold or contractual interests in) all Assets, free and clear of all liens, claims, charges, set-offs, encumbrances or restrictions of every kind ("Lien"), except for the Liens set forth in Schedule 2.7. There are no contractual or legal restrictions that preclude or restrict the ability to use any Permit or any of the Assets owned, held, or leased by the Company for the purposes for which it is currently being used. The Assets held by the Company include all of the properties, assets, rights, contracts,

leases, easements, licenses and personal property sufficient to conduct the Business after Closing as it is presently conducted by the Company or as it is contemplated to be conducted.

**2.8    Compliance with Licenses, Permits, Laws and Other Instruments.**

(a)    <u>Licenses and Permits</u>. Attached hereto as <u>Schedule 2.8(a)</u> is a list of all Permits held or applied for by the Company which relates to the conduct of the Business and which have a material effect on the Business.

(b)    <u>Conflicts</u>. The conduct of the Business does not conflict with the rights of any other Person, violate or, with or without the giving of notice or the passage of time, or both, will violate, conflict with or result in a default, right to accelerate or loss of rights under, any terms or provisions of the Governing Documents of the Company, as presently in effect, or any Lien, lease, license, agreement, understanding, or Law to which the Company is a party or by which the Company may be bound or affected.

(c)    <u>Government Consent</u>. The Company is not aware of any proposed law, governmental taking, condemnation or other proceeding which would be applicable to the Business and which might have a Material Adverse Effect on the Business either before or after the Closing. No consent, qualification, order, approval, or authorization of, or filing with, any Governmental Authority or other Governmental Authority is required in connection with the Company's execution, delivery and performance of this Agreement, and the Related Agreements and the consummation of any transaction contemplated hereby and thereby.

**2.9    Contracts and Agreements.** <u>Schedule 2.9</u> contains a list of all written or oral contracts, commitments, leases, and other agreements (including, without limitation, promissory notes, loan agreements, and other evidences of Indebtedness, guarantees, agreements with employees, contractors, consultants, distributors, suppliers, customers, and service agreements): (i) by which the Company or its properties are bound or are contemplated to amount to $1,000 or more in any fiscal year; (ii) that are terminable by the Company only upon more than thirty (30) calendar days prior written notice, (iii) that are otherwise material to the Business; or (iv) the absence of which would, individually or in the aggregate, have a Material Adverse Effect on the Company or the Business (together, the "<u>Material Contracts</u>"). Each of the Material Contracts is legal, valid and binding and in full force and effect, and neither the Company, nor any other party to such Material Contract is in violation of or in default in the performance, observance or fulfillment of any material obligation, agreement, covenant or condition contained in such Material Contract. The Company has not received any notice, oral or written, from any party to any Material Contract (i) stating that such party intends not to perform, observe or fulfill any of its obligations, agreements, covenants or conditions under such Material Contract, or (ii) claiming that the Company is in violation or breach of, or default under, any Material Contract. The Company is not in default under or in breach of any of the Material Contracts. Neither the execution of this Agreement or the Related Agreements nor the consummation of any transaction contemplated by this Agreement or the Related Agreements shall constitute a default under, give rise to cancellation rights under, or otherwise adversely affect any of the rights of the Company under any Material Contract. The Company has furnished to Buyer true and complete copies of all Material Contracts, including any and all amendments to such Material Contracts.

**2.10    Employment Contracts and Employee Plans.**

(a)    _List of Employees._ Schedule 2.10(a) contains a complete and accurate list of the following information for each employee, independent contractor, consultant and agent of the Company, including each employee on leave of absence or layoff status: name; job title; date of hiring or engagement; date of commencement of employment or engagement; current compensation paid or payable and any change in compensation since July 1, 2013; sick and vacation leave that is accrued but unused; and service credited for purposes of vesting and eligibility to participate under any Employee Plan, or any other employee benefit plan.

(b)    _Employee Information._ All of the Company's workers are either United States citizens, lawful permanent residents of the United States, or are otherwise authorized to work in the United States. All of the Company's (a) employment practices, including, but not limited to, those relating to the hiring and retention of workers, and (b) employment records, including, but not limited to, its Employment Eligibility Verification Forms (Form I-9) and all record keeping and retention practices in support thereof, are in compliance with all applicable Laws, including without limitation all applicable drug and alcohol testing requirements of each Governmental Authority. The Company has not received any written notices of violation or potential violation of any such Laws, and there are no conditions or circumstances which might lead to the Company receiving any such notice of violation or potential violation.

(c)    _Terminated Employees._ Schedule 2.10(c) states the number of employees terminated by the Company since July 1, 2013, and contains a complete and accurate list of the following information for each employee of the Company who has been terminated or laid off, or whose hours of work have been reduced by more than fifty percent (50%) by the Company, since July 1, 2013: (i) the date of such termination, layoff or reduction in hours; and (ii) the reason for such termination, layoff or reduction in hours. Except as disclosed on Schedule 2.10(c), the Company has no obligations of any kind to any of such employees or former employees.

(d)    _Employee Agreements._ Schedule 2.10(d) contains a list of all of the Company's (i) agreements with any employees, written or oral, concerning term of employment, compensation, benefits, or severance and (ii) written employee policies, whether set forth in an employee manual, employee statement of policy, work rules for any employee or group of employees, or otherwise.

(e)    _WARN Act._ The Company is not subject to, or if applicable, has not violated the Worker Adjustment and Retraining Notification Act (the "WARN Act") or any similar state or local legal requirement. During the ninety (90) day period between April 17, 2014 and July 11, the Company has terminated four (4) employees.

(f)    _Employee Contracts Affecting Services._ No employee, consultant, agent or contractor of the Company is bound by any contract that purports to limit his ability (i) to engage in or continue or perform any conduct, activity, duties or practice relating to the Business, or (ii) to assign to the Company or to any other Person any rights to any invention, improvement, or discovery. No former or current employee of the Company is a party to, or is otherwise bound by, any contract that in any way adversely affected, affects, or will affect the ability of Buyer to conduct the Business as heretofore carried on by the Company.

**2.11**   **Employee Benefits.**  Employee Benefits.

(a)   Employee Benefit Plans. Set forth in Schedule 2.11(a) is a complete and correct list of all "employee benefit plans" as defined by Section 3(3) of the Employment Retirement Income Security Act of 1974, as amended ("ERISA"), all specified fringe benefit plans as defined in Section 6039D of the Code, and all other bonus, incentive-compensation, deferred-compensation, profit-sharing, stock-option, stock-appreciation-right, stock-bonus, stock-purchase, employee-stock-ownership, savings, severance, change-in-control, supplemental-unemployment, layoff, salary-continuation, retirement, pension, health, dental, vision, life-insurance, disability, accident, group-insurance, vacation, holiday, sick-leave, fringe-benefit or welfare plan, and any other compensation or benefit plan, agreement, policy, practice, commitment, contract or understanding (whether qualified or nonqualified, currently effective or previously terminated, written or unwritten) that (i) is or was maintained or contributed to by the Company or any other corporation or trade or business that, together with the Company, is treated as a single employer pursuant to Section 414 of the Code or Section 4001(a)(14) or 4001(b) of ERISA ("ERISA Affiliate") for the benefit of any current or former director, officer, employee or service provider of, the Company or any ERISA Affiliate, or the dependents of any thereof, or (ii) with respect to which the Company or any ERISA Affiliate has or may have any liability (collectively the "Employee Plans").

(b)   Plan Documents. The Company has delivered to Buyer true, accurate and complete copies of (i) the documents comprising each Employee Plan (or, with respect to any Employee Plan which is unwritten, a detailed written description of eligibility, participation, benefits, funding arrangements, assets and any other matters which relate to the obligations of the Company or any ERISA Affiliate); (ii) all trust agreements, insurance contracts or any other funding instruments related to the Employee Plans; (iii) all rulings, determination letters, no-action letters or advisory opinions from the IRS, the U.S. Department of Labor, or any other Governmental Authority that pertain to each Employee Plan and any open requests therefor; (iv) the most recent actuarial and financial reports (audited and/or unaudited) and the annual reports filed with any Governmental Authority with respect to the Employee Plans during the current year and each of the two preceding years; (v) all contracts with third-party administrators, actuaries, investment managers, consultants and other independent contractors that relate to any Employee Plan, and (vi) all summary plan descriptions, summaries of material modifications and memoranda, employee handbooks and other written communications regarding the Employee Plans.

(c)   Compliance with Law. Each Employee Plan complies in all material respects in form and in operation with its terms, with all applicable collective bargaining agreements, and all applicable Laws. Each return, report statement, notice, declaration and other document required by any law or governmental agency, federal, state and local (including, without limitation, the IRS and the U.S. Department of Labor) with respect to each such Employee Plan has been filed, and each of such filings has been complete and accurate in all material respects, and no liability in connection with such filings has been incurred.

(d)   Tax-Qualified Retirement Plans. Each Employee Plan that is intended to be tax-qualified under Section 401(a) of the Code is either (i) the recipient of a favorable determination letter from the IRS, or (ii) a volume submitter or master and prototype plan as to which the

13

adopter is entitled to rely on the advisory or opinion letter issued by the IRS with respect to the qualified status of such plan under Section 401 of the Code to the extent provided in Revenue Procedure 2005-16, and no event has occurred that could reasonably be expected to result in the loss of tax-qualified status of such Employee Plan.

(e)   No Prohibited Transactions.   Neither the Company nor any ERISA Affiliate or their employees, owners or directors has engaged in any material nonexempt "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code.   Neither the Company nor any ERISA Affiliate has any Liability for breach of fiduciary duty with respect to any Employee Plan subject to Title I of ERISA or any other failure to act in accordance with Title I of ERISA or comply with Title I of ERISA in connection with the administration of, or investment or valuation of the assets of, any such Employee Plan.

(f)   No Title IV or Other Liability.   Neither the Company nor any ERISA Affiliate (A) has within the preceding six years maintained, contributed to, or had or has any obligation to contribute to or had or has any Liability (contingent or otherwise) to any "multiemployer plan," as that term is defined in Section 4001(a)(3) of ERISA, or any plan that is subject to Title IV of ERISA or Section 412 of the Code, or (B) sponsors or contributes to, is required to contribute to or has any Liability with respect to any "voluntary employees' beneficiary association" within the meaning of Section 501(c)(9) of the Code, "welfare benefit fund" within the meaning of Section 419 of the Code, "qualified asset account" within the meaning of Section 419A of the Code, or "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(g)   No Post-Retirement Welfare Benefits.   Except as set forth in Schedule 2.11(g), neither the Company nor any ERISA Affiliate maintains or contributes to any Employee Plan which provides for continuing welfare benefits or coverage (including, without limitation, life insurance or medical benefits) for any participant or beneficiary of a participant after such participant's termination of employment, except as may be required by Section 4980B of the Code, Section 601 et seq. of ERISA or any similarly applicable state Law.

(h)   No Claims.   There are no pending or, to the Knowledge of the Company, threatened audits, claims (other than claims for benefits in the ordinary course) or Claims or Proceedings with respect to any Employee Plans.

(i)   Contributions and Premiums.   All contributions or insurance premiums required to have been made by the Company or any ERISA Affiliate to any Employee Plan pursuant to Law (including ERISA and the Code) or the terms of such Employee Plan have been made within the time prescribed by Law and the terms of such Employee Plan.

(j)   Amendment and Termination of Plans.   Each Employee Plan permits the plan sponsor to amend or terminate the plan at any time and without any liability (other than routine claims for benefits and reasonable administrative expenses), subject to the applicable requirements of ERISA and the Code for plan termination.

(k)   Benefits not Triggered.   Except as set forth in Schedule 2.11(k), the consummation of the Transaction will not constitute a triggering event under any Employee Plan

14

which will result in any accelerated vesting or increase in benefits or the payment of benefits or compensation to any employee or former employee (or other current or former service provider) of the Company or any of its ERISA Affiliates.

(l)     409A Compliance. Each Employee Plan that is a "nonqualified deferred compensation plan" (within the meaning of Code Section 409A(d)(1)) has at all times complied in form and in operation with the requirements of Section 409A of the Code and the guidance issued thereunder. Neither the Company nor any of its ERISA Affiliates has any obligation to pay, gross up, or otherwise indemnify any employee or other service provider for Taxes or any other costs incurred as a result of a violation of Section 409A of the Code or Section 4999 of the Code.

**2.12    Labor Disputes; Compliance.**

(a)     Compliance. The Company has complied in all material respects with all Laws relating to employment practices, terms and conditions of employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, occupational safety and health, and other requirements under applicable Laws, including without limitation all applicable drug and alcohol testing requirements of each Authority. The Company is not liable for the payment of any Taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of the foregoing legal requirements.

(b)     Labor Relations. The Company has not been, and is not now, a party to any collective bargaining agreement or other labor contract; (ii) since July 1, 2013, there has not been, there is not presently pending or existing, and to the Sellers' Knowledge there is not threatened, any strike, slowdown, picketing, work stoppage or employee grievance process involving the Company; (iii) to the Sellers' Knowledge no event has occurred or circumstance exists that could provide the basis for any work stoppage or other labor dispute; (iv) there is not pending or, to the Sellers' Knowledge, threatened against or affecting the Company any Proceeding relating to the alleged violation of any Laws pertaining to employment matters, including any charge or complaint filed with any Governmental Authority, and there is no organizational activity or other labor dispute against or affecting the Company or the facilities; (v) no application or petition for an election of or for certification of a collective bargaining agent is pending; (vi) no grievance or arbitration Proceeding exists that might have an Material Adverse Effect upon the Company or the conduct of its business; (vii) there is no lockout of any employees by the Company, and no such action is contemplated by the Company; and (viii) to the Seller's Knowledge there has been no charge of discrimination filed against or threatened against the Company with the Equal Employment Opportunity Commission or similar Governmental Authority.

**2.13    OSHA.**

(a)     Compliance. The operations of the Company have been and are in compliance with OSHA and all OSHA-required Permits. The Company has all Permits required under OSHA necessary to operate the Business. The Company has not received any written communication alleging that the Company might be in violation of OSHA or any Permit issued or required pursuant to OSHA, or has or might have any Liability under OSHA, as a result of the

conduct of the Business. There are no Claims or Proceedings that could lead to the imposition of any Liability on the Company pursuant to OSHA as a result of the conduct of the Business.

(b)  OSHA Notices. Schedule 2.13(b) sets forth all reports related to any OSHA audit with respect to the Company performed since December 31, 2008 of the Company by any Person (including the Company or any Affiliate thereof) or any Governmental Authority.

2.14  Claims and Proceedings. There are no enforcement actions, claims, actions, demands, notices of violation, consent agreements, suits, legal or administrative proceedings or investigations pending or threatened, against the Company or relating to the Business or the transactions contemplated by this Agreement or the Related Agreements ("Claims or Proceedings"), and the Company has no Knowledge of, nor has any reason to be aware of, any basis for the same other than those set out in Schedule 2.14. In particular, and without limiting the generality of the preceding sentence, there are no Claims or Proceedings, and no basis for any Claim or Proceeding, arising out of the Business prior to the Closing, and there are no Claims or Proceedings involving any Governmental Authority. There is no agreement, judgment, injunction, order, or decree served upon the Company which has or could reasonably be expected to have the effect of prohibiting or impairing any current business practice of the Company, any acquisition of property by the Company, or the overall conduct of business of the Company as currently conducted, such that the result thereof could have a Material Adverse Effect on the Company or the Business.

2.15  Taxes.

(a)  Returns. Except as disclosed in Schedule 2.15(a), as of the Closing Date, the Company has filed all Tax Returns that it was required to file and all such Tax Returns are correct and complete in all material respects. All Taxes owed by the Company (whether or not shown on any Tax Return) have been paid in a timely fashion. Except as disclosed in Schedule 2.15, the Company has not received written notice from a Governmental Authority in a jurisdiction where the Company does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no Liens (and immediately following the Closing Date, there will not be) on any of the assets of the Company that arose in connection with any failure (or alleged failure) to pay any Tax when due.  There is no basis for the assertion of any claim relating or attributable to Taxes which, if adversely determined, would result in any Lien on the assets of the Company.

(b)  Withholdings. Except as disclosed in Schedule 2.15(b), the Company has timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owed to any employee, creditor, member, or other third party.

(c)  Assessments. Except as disclosed in Schedule 2.15(c), and except for the California Franchise Tax Board's currently pending and disputed but paid assessment, the Company does not expect any Governmental Authority to assess any additional Taxes for any period for which Tax Returns have been filed. Except as disclosed in Schedule 2.15(c), there is no dispute or claim concerning any Liability of the Company either (i) claimed or raised by any Governmental Authority in a writing received by the Company or (ii) otherwise as to the Knowledge of the Company, Schedule 2.15(c) lists all Tax Returns filed since December 31,

2005 that have been audited, those Tax Returns that currently are the subject of audit and those Tax Returns showing Taxes that have not been paid in a timely fashion. The Company has made available to Buyer correct and complete copies of all Tax Returns, examination reports, and statements of deficiencies filed by, assessed against or agreed to by the Company since December 31, 2005. The Company has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(d)     <u>Payments Prior to Closing</u>. All Tax Returns and reports of the Company required by Law to be filed on or before the Closing have been duly filed or duly extended to a date in the future, and all federal, state, local, foreign and any other taxes (including interest and penalties), assessments, fees and other governmental charges with respect to the properties, assets, income, sales, or use of the Company relating to the Business and due on or prior to the Closing have been paid.

(e)     <u>Audit</u>. In 2010, the Company was audited by the Internal Revenue Service ("<u>IRS</u>") and it resulted in a refund to the Company. In the audit, the IRS did not identify any issue concerning the tax election or lack of election by RSC or the lack of a Q-Sub election by either RSC or RTSC. There have been no other audits of The Company by any Governmental Authority.

**2.16    Real Properties; Leases.**

(a)     <u>Leases</u>. The Company does not own any real property. <u>Schedule 2.16(a)</u> is a list setting forth all leases under which the Company possesses or uses real property (the "<u>Real Property Leases</u>") and all leases under which the Company possesses or uses items of tangible personal property that are material to conduct of the Business (the "<u>Personal Property Leases</u>"). True, correct and complete copies of the Real Property Leases and Personal Property Leases (collectively, the "<u>Leases</u>") have been delivered to Buyer, together with the names and addresses of the lessors thereunder. The Leases are in full force and effect and the Company is not in default. To the Knowledge of the Company, (i) the other parties to the Leases are not in default thereunder and (ii) no facts or circumstances have occurred which, with the passage of time or the giving of notice, or both, would constitute a default by the Company or the other parties, under any of the Leases.

(b)     <u>Condition of the Leased Real Property</u>. (i) All structures and facilities on the real properties listed on <u>Schedule 2.16(a)</u> (the "<u>Leased Real Property</u>") are equipped in substantial conformity with Laws applicable to the Company, (ii) the zoning of each parcel of real property permits the presently existing improvements and continuation of the Business presently conducted thereon by the Company, and (iii) no zoning changes, and no condemnation or similar proceedings, are pending or threatened against any of the real properties listed on <u>Schedule 2.16(a)</u>. The plumbing, mechanical, heating, ventilation, air conditioning, electric wiring and water and sewage systems are in good working order, normal wear and tear excepted.

**2.17    Insurance; Professional Liability/Errors and Omissions.**

(a)     <u>Insurance</u>. <u>Schedule 2.17</u> contains a listing of all policies of fire, general liability, worker's compensation, errors and omissions, Governmental-related, liability, malpractice and

17

other types of insurance maintained by or on behalf of the Company, to provide insurance protection for the assets or the Business. All of such policies are now in full force and effect and those policies or other policies covering the same risks and in substantially the same amounts have been in full force and effect continuously for the past three (3) years, and provide coverage for the properties, assets, and activities and operations of the Company in the amounts and against the risks required (i) to comply with all Laws, (ii) to conform to the standard levels of insurance maintained in the industry in which the Company operates and (iii) to comply with the requirements of each Material Contract. The Company has not received any notice of cancellation or material amendment of any such policies; and, all material claims thereunder have been filed in a timely fashion. The activities and operations of the Company have been conducted in a manner so as to conform in all material respects to all applicable provisions of such insurance policies. The Company shall maintain all such insurance policies in effect from the date hereof until the Closing.

(b)     Professional Liability/Errors and Omissions. As of the Closing Date, no claim relating to errors or omissions or professional liability has been made against the Company. To the best of each Sellers' knowledge, there are no facts or circumstances which are reasonably likely to give rise to such claim.

2.18     **Books and Records.** The books of account, other financial records, and all records maintained or required to be maintained in connection the Company as they relate to Business are complete and correct in all material respects, and there have been no transactions involving the Business which properly should have been set forth therein and which have not been accurately so set forth in all material respects. All documents accurately and completely reflect particulars required by any applicable Law.

2.19     **Financial Statements.** Attached as Schedule 2.19 are true, correct and complete copies of the ("Financial Statements"): (a) compiled financial statements (a balance sheet, income statement and statement of cash flows) of the Company for the calendar years ended 2010, 2011, 2012, and 2013 and (b) unaudited financial statements (a balance sheet, income statement and statement of cash flows) for all months following December 31, 2013 (the "Interim Financial Statements"). The Financial Statements are true, correct and complete in all material respects, and fairly present and describe the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein. The Financial Statements have been prepared consistent with the Company's past practices, and there has been no change in the Company's keeping of its books of account or accounting practices relating to the Business for the three-year period ended on the Closing Date.

2.20     **Accounts Receivable.** All of the accounts, notes, and loans receivable that have been recorded on the books of the Company are bona fide and represent amounts validly due for services rendered. Except as disclosed on Schedule 2.20 hereto (a) all of such accounts, notes, and loans receivable are owned by the Company free and clear of any Liens or other charge; (b) none of such accounts, notes, or loans receivable is subject to any offsets or claims of offset; and (c) none of the obligors of such accounts, notes, or loans receivable has given notice that it will or may refuse to pay the full amount or any portion thereof.     Company, as of the date hereof, and shall have at the Closing Date, has accounts receivable, which is defined as all amounts billed to customers for which payment has not been received ("Accounts Receivable"),

18

of at least $1 million that is aged less than ninety (90) days from the invoice date without any and not including any credits due customers of the Company.  See Exhibit A-6, as amended from time to time to be current, for the Accounts Receivable as of the cut-off date for finalization of funding as described in Section 5.1(i).

**2.21    Accounts Payable.** Schedule 2.21 is an aged list of the accounts payable of the Company and in respect of the Business as of the close of business on the Closing Date. All such accounts payable arose from the purchase of goods and services in the ordinary course of business.

**2.22    Bank Accounts.** Schedule 2.22 is a list of all banks or other financial institutions with which the Company has an account or maintains a safe deposit box, showing the type and account number of each such account and safe deposit box and the names of the persons authorized as signatories thereon or to act or deal in connection therewith.  The schedule shall specifically additionally identify all trust escrow accounts. ("Trust Accounts"), which shall be included in the Assets and transferred at Closing.

**2.23    Environmental Matters.**

(a)    Environmental Proceedings. There are no Claims or Proceedings, existing or pending, or to the Knowledge of the Sellers threatened, relating to the Company, the properties subject to the Real Property Leases or any other property or facility operated or leased, or previously owned, operated or leased by the Company relating in any way to the Environmental Laws or any regulations, code, plan, Order, decree, judgment or injunction.

(b)    Release. Neither the Company nor any other person has released, placed, stored, buried, dumped, disposed or arranged for disposal of any Hazardous Substances or any other substances produced by, or resulting from, any business, commercial or industrial activities, operations or processes, on or beneath the Leased Real Property except for inventories of such substances to be used, and wastes generated therefrom, in the ordinary course of business of the Company provided that such excepted inventories and wastes, if any, were and are stored, handled and disposed of in accordance with applicable Laws and in a manner such that there has been no release of any such substances into the environment in violation of the Environmental Laws or in a manner that would give rise to costs or liability under any Environmental Law.

(c)    Liens. No releases have occurred at the properties subject to the Real Property Leases, which could result in the assertion or creation of a Lien on such properties by any Governmental Authority or agency with respect thereto, nor has any such assertion of a Lien been made by any Governmental Authority or agency with respect thereto.

(d)    Environmental Conditions. None of the following exists at the properties subject to the Real Property Leases: asbestos-containing material in any form or condition; materials or equipment containing polychlorinated biphenyl; or landfills, surface impoundments or disposal areas.

(e)    Storage Tanks. There are no underground and above-ground storage tanks currently or formerly owned or operated by the Company or located on or beneath the properties subject to the Real Property Leases.

19

**2.24    Intellectual Property.**

(a)    Attached hereto as Schedule 2.24(a) is a list and brief description of all patents, patent rights, trademarks, trade names, copyrights, service marks, trade secrets or applications therefor and other items of intellectual property or industrial property and computer programs, software and data, information, or knowledge owned or used by or registered in the name of the Company or any Affiliate or in which the Company has or uses any rights, licenses, immunities, or rights (collectively, the "Intellectual Property").

(b)    Attached hereto as Schedule 2.24(b) is a list of all license agreements to which the Company is a party, either as licensor or licensee, with respect to any Intellectual Property.

(c)    The Company has good and marketable title to or the right to use all the Intellectual Property for the conduct of the Business as presently conducted or operated without the payment of any royalty or similar payment, and the consummation of the transactions contemplated by this Agreement and the Related Agreements do not and will not violate, impair, or otherwise interfere with the Company's right to use all of the Intellectual Property after the Closing Date in substantially the same way as the Intellectual Property was used just before the Closing.

(d)    The Company has not received any notice of any infringement, misappropriation, or wrongful use of any of the Intellectual Property. There has been no claim presented whether for infringement or otherwise by any third party which relates to the use of any Intellectual Property in connection with the Business. The Company is not infringing any patent right, trade name, copyright, trademark, or other Intellectual Property right of others, and the Company has no Knowledge or is aware of any infringement, misappropriation, or wrongful use by others of any such rights owned, licensed, or held by the Company. The Company has not granted any licenses, releases, security interests or other rights in or relating to any Intellectual Property.

(e)    No claim by any third party contesting the validity, enforceability, use or ownership of any Intellectual Property owned, held under license, or used by the Company has been made, or to the Knowledge of the Sellers, is threatened or contemplated.

(f)    All acts required in connection with the preservation and protection of the Intellectual Property owned, licensed, or used by the Company have been timely and duly made and all fees in connection therewith have been fully and timely paid.

(g)    No former or current employee, consultant, contractor, agent, or advisor of the Company has any right to, or any claims in connection with, any Intellectual Property owned, licensed, or used by the Company.

(h)    All of the Intellectual Property owned, held under license, or used in connection with the Business prior to the Closing will be owned or licensed by, or available for use by, the Company on substantially the same terms and conditions from and after the Closing.

**2.25    Brokers.** Except as set forth on Schedule 2.25, the Company has not engaged, or caused to be incurred any liability for any brokerage or finders' fees or agents' commissions or like payment to, any finder, broker, or sales agent in connection with the origin, negotiation,

execution, delivery, or performance of this Agreement or the transactions contemplated hereby, and all compensation payable to any such party shall be the sole responsibility of Sellers, and Buyer shall have no responsibility therefor.

**2.26    Illegal Payments; FCPA.** Neither the Company nor any of its officers, directors, employees, agents or representatives has at any time made or committed to make, or has been alleged to have made or committed to make, any payments for illegal political contributions or made any bribes, kickback payments or other illegal payments. Neither the Company nor any of its officers, directors, employees, agents or representatives has made, offered or agreed to offer anything of value to any governmental official, political party or candidate for governmental office (or any person that the Company knows, or has reason to know, will offer anything of value to any governmental official, political party or candidate for political office), such that the Company or any of its officers, directors, agents or representatives has violated the United States' Foreign Corrupt Practices Act of 1977, as amended from time to time, and all applicable rules and regulations promulgated thereunder or any other applicable laws governing corrupt or illicit business practices. There is not now nor has there ever been any employment (or retention as a consultant or advisor) by the Company or any of its officers, directors, agents or representatives, of any governmental or political official in any country while such official was in office. The internal accounting controls of the Company are believed by the management of the Company to be adequate to detect any of the foregoing under current circumstances.

**2.27    Related Party.** Except as set forth in Schedule 2.27, no employee, officer, or director of the Company (a "Related Party") or member of such Related Party's immediate family, or any corporation, partnership or other entity in which such Related Party is an officer, director, member or partner, or in which such Related Party has significant ownership interests or otherwise controls, is indebted to the Company, nor is the Company indebted (or committed to make loans or extend or guarantee credit) to any of them. Further, none of such Persons has any direct or indirect ownership interest in any person or entity with which the Company is affiliated or with which the Company has a business relationship, or any Person that competes with the Company, except that employees, officers, or directors of the Company and members of such Related Party's immediate families may own stock in publicly traded companies that may compete with the Company. No Related Party or member of their immediate family is directly or indirectly interested in any contract set forth in Schedule 2.9, except as disclosed on Schedule 2.27.

**2.28    Active Files and WIP.** As of July 15, 2014, the Company had 4091 Active Files not including any files for property located in Oregon. At Closing, there shall be at least 4,050 Active Files of the Company. "Active Files" are foreclosure files being serviced by the Company that are open and have WIP. "WIP" is work in progress as unbilled fees on such Active Files, that includes active foreclosure files that are either (a) on a hard hold by the lender or beneficiary; (b) on a soft hold by the lender or beneficiary; or (c) are active with work to be done prior to foreclosure. WIP includes only unbilled fees and not unbilled costs. Historically, unbilled costs equal 61% of all fees and costs billed to its clients on all files of the Company, including but not limited to the Active Files.   See Exhibit A-7 for the WIP, as amended to be current from time to time,

**2.29   States in Which Doing Business.** Company conducts business in only the following states: Washington, Alaska, California, Nevada, Idaho, Montana and Oregon.

**2.30   Intentionally deleted.**

**2.31   Information Furnished.** Any information furnished to Buyer by the Company is true, correct and complete in all material respects. Such information states, or when furnished will state, all material facts necessary to make the statements therein, in light of the circumstances under which the statements are made, not misleading. The Sellers have no Knowledge of any matter which has not been disclosed to Buyer which materially and adversely affects or, so far as the Sellers can now reasonably foresee, will materially and adversely affect the Company or the Business.

### ARTICLE III
### BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to the Sellers as follows that as of the date hereof as and of Closing:

**3.1   Due Organization.** Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to enter into and perform this Agreement and the Related Agreements.

**3.2   Due Authorization.** The execution and delivery of this Agreement, the Related Agreements and the performance of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of Buyer, and the Agreement has been duly and validly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer, enforceable in accordance with its terms. The execution, delivery, and performance of this Agreement and the Related Agreements (as well as all other instruments, agreements, certificates or other documents contemplated hereby) by Buyer will not (a) violate any Laws applicable to Buyer or its respective properties, or (b) violate or conflict with any provision of the Governing Documents of Buyer, except in each such case as would not have a Material Adverse Effect on Buyer.

**3.3   No Brokers.** Buyer has not engaged, or caused to be incurred any Liability to any finder, broker or sales agent in connection with the origin, negotiation, execution, delivery, or performance of this Agreement or the transactions contemplated hereby.

### ARTICLE IV
### COVENANTS

**4.1   Conduct of Business Pending Closing.** From the date of this Agreement to the Closing Date, the Company shall preserve the Company's business organization and present relationships with its customers, suppliers, employees, and each Governmental Authority. The Company will not cause or permit the Company to, take any action that could reasonably be expected to have a Material Adverse Effect on the Company, the Business, or the transactions contemplated by this Agreement and without the prior written consent of Buyer, the Company will not engage in any

practice, take any action, or enter into any transaction outside the ordinary course of the Business as conducted prior to the date of this Agreement. Without limiting the generality of the foregoing, without such consent:

(a)     The Company will not sell, lease, transfer, or assign any assets, tangible or intangible, other than for a fair market value in the ordinary course of business, it being understood and agreed that no transfer of a Permit shall be considered in the ordinary course of business.

(b)     The Company will not enter into any agreement, contract, lease, (or license or series of related agreements, contracts, leases and licenses) outside the ordinary course of business.

(c)     The Company will not accelerate, terminate or cancel any agreement, contract, lease, or license (or series of related agreements, contracts, leases and licenses) involving more than $1,000 to which the Company is a party or by which it is bound.

(d)     The Company will not impose or permit to be imposed any Lien upon any of its assets, tangible or intangible.

(e)     The Company will not make any capital investment in, any loan to, or any acquisition of the securities or assets of, any other person outside the ordinary course of business.

(f)     The Company will not issue any note, bond, or other debt security or create, incur, assume, or guarantee any Indebtedness or capitalized lease obligation involving more than $1,000 in the aggregate.

(g)     The Company will not merge with any other company, consolidate or sell or consent to the sale of any of the material assets of the Company or acquire any material assets outside the ordinary course of business.

(h)     The Company will not increase the compensation or benefits payable to its employees other than scheduled increases in the ordinary course of business.

(i)     The Company will not make any change in its accounting, collection or payment practices.

(j)     The Company will maintain insurance consistent with past practices and, unless comparable insurance is substituted therefor or is not generally available to businesses of the type conducted by the Company, not take any action to terminate or modify, or permit the lapse or termination of, the present insurance policies and coverages of the Company as set forth in Schedule 2.17.

(k)     The Company will promptly notify Buyer of any Claims or Proceeding that is commenced, or that is threatened, in writing, against the Company and that relates to or arises out of the Business.

(l)     The Company will not settle any action or proceeding on terms that are expected to have a Material Adverse Effect on the Company or the Business, nor release, settle, compromise or relinquish any claims, causes of action or rights involving more than $1,000, individually, or $2,500 in the aggregate which the Company may have against any other persons including, without limitation, claims or rights to reimbursement or payment for services rendered by the Company.

(m)     The Company will maintain in good working order and condition, ordinary wear and tear excepted, all of the assets of the Company, including performing any maintenance or repair in accordance with past practice.

(n)     The Company will maintain its Inventories of parts, supplies and other assets at substantially the same level as existed on the date hereof.

(o)     The Company will use commercially reasonable efforts to obtain and maintain all consents, assignments or approvals of, and licenses, permits and franchises and rights to operate granted by, each Governmental Authority, the absence or loss of which is may have a Material Adverse Effect on the Company or the Business.

(p)     The Company will not take any action which may result in a violation by the Company of, or in the noncompliance by the Company with applicable Laws, manufacturer's requirements or recommendations, or any Material Contract, which in any case may have a Material Adverse Effect on the Company or on the Business.

(q)     The Company will cooperate with Buyer and render to Buyer such assistance as Buyer may reasonably request, in obtaining any Permit as Buyer considers necessary or appropriate.

(r)     The Company will (i) pay, when due, and prior to the imposition or assessment of any interest, penalties or Liens by reason of the nonpayment of, all Taxes due or assessed against it, except for any Taxes being contested in good faith and for which accounting reserves have been established by the Company, and (ii) file all Tax Returns when due.

(s)     The Company will maintain, renew, and not alter any right, privilege, or immunity, held by the Company on the date of this Agreement, and will not take any action which may result in a violation, cancellation, suspension, or impairment of, or any change in, any existing application or new application, or for any other right, privilege, or immunity existing or being sought on the date of this Agreement.

(t)     The Company shall give prompt notice to Buyer of any notice of material default received by the Company subsequent to the date of this Agreement under any Material Contract or any Material Adverse Change occurring prior to the Closing.

4.2     **Consents of Others.** Prior to the Closing, the Company shall obtain all Permits required of the Business and the Company to permit consummation of the transactions contemplated by this Agreement. In addition, the Company shall, at the request of Buyers, give reasonable assistance to Buyer, and cause its personnel to provide reasonable assistance to and cooperation with Buyer as it contacts customers, suppliers, lenders, and others with which the Company has

business relationships and seeks consent to the transaction and agreement to continue such relationships with the Company and Buyer after consummation of the transaction.

**4.3     Notification of Certain Matters.** The Company shall give prompt notice to Buyer of the occurrence, or non-occurrence, of any event the occurrence, or non-occurrence, of which is reasonably likely (a) to cause any representation or warranty of the Company contained in this Agreement to be untrue or inaccurate if made as of any time at or prior to the Closing Date; or (b) to result in any failure of the Company to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied hereunder; provided, however, that the delivery of any notice pursuant to this Section 4.3 shall not limit or otherwise affect the remedies available hereunder to any of the parties receiving such notice

**4.4     Further Assurances.** In case at any time after Closing any further action is necessary to complete the transfer of the Assets to Buyer, or otherwise to carry out the purposes of this Agreement, the Sellers shall take all such action without any further consideration therefor.

**4.5     Access to Records Before Closing.** Prior to the Closing, the Company shall give, or cause to be given, to Buyer and its representatives full and unrestricted access, upon reasonable notice, to the Company's assets, properties, titles, operations, contracts, corporate minute and other books, records, Permits, files and documents of the Company to review and to make copies of all such materials. The Company will provide Buyer opportunities to meet with key employees of the Business, to visit facilities of the Business and to otherwise conduct due diligence in respect of the Company.

**4.6     Disclosure Schedules.** The Sellers agree and acknowledge that the disclosure schedules delivered by Sellers in connection with the execution and delivery of this Agreement are the sole responsibility of the Sellers notwithstanding any assistance or input of Buyer in the preparation and review of such disclosure schedules.

## ARTICLE V
## CONDITIONS TO OBLIGATION OF PARTIES TO CONSUMMATE CLOSING

**5.1     Conditions to Buyer's Obligations.** The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to satisfaction on or prior to the Closing of the following conditions (any of which may be waived by Buyer in writing):

         (a)     Covenants, Representations and Warranties. The Company shall have performed all obligations and agreements and complied with all covenants contained in this Agreement to be performed and complied with by each of them prior to or at the Closing. Each of the representations and warranties of the Company set forth in Article II hereof shall be true and correct as of the date hereof and as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout Article II).

         (b)     Consents. All requirements for the valid consummation by the Company of the transactions contemplated by this Agreement shall have been fulfilled, all applicable waiting periods, if any, shall have lapsed, and all authorizations, consents, waivers and approvals of any applicable Governmental Authority required or recommended to be obtained (as reasonably determined by Buyer) in order to permit Buyer to acquire the Assets and assume the Assumed

25

Liabilities, and for the Company to operate the Business after the Closing in substantially the same way as the Business was operated just before the Closing, shall have been obtained in form and substance satisfactory to Buyer in its sole discretion. All approvals of the Company necessary for the consummation of this Agreement and the transactions contemplated hereby shall have been obtained. Notwithstanding the generality of the foregoing, (i) Buyer shall on or before the Closing Date have received evidence satisfactory to Buyer in its sole discretion from each Authority listed on Schedule 5.1(b) that each Authorization listed will continue in full force and effect after the Closing on the same basis as such Authorization was in force just prior to the Closing, and (ii) Buyer shall on or before the Closing Date have received evidence satisfactory to Buyer in its sole discretion from each Person listed on Schedule 5.1(b) that each Material Contract listed opposite such Person will continue in full force and effect after the Closing on the same basis as such Material Contract was in force just prior to the Closing, in each case irrespective of the transactions contemplated by this Agreement and the Related Agreements, and (iii) the consummation of this Transaction contemplated hereby shall not trigger any default resulting from a failure to acquire consent from such party.

(c)     Litigation. No Claims or Proceedings shall have been instituted before, or by, any Governmental Authority, to restrain, modify or prevent the consummation of the transaction contemplated hereby, or to seek damages in connection with such transaction, or that has or may be expected to have, a Material Adverse Effect on Buyer's right to own, operate, or control the Business.

(d)     Material Adverse Change. The Company shall not have experienced any Material Adverse Change.

(e)     Due Diligence. Buyer shall be satisfied, in its sole discretion, with the results of the due diligence investigation concerning the Company, which shall be continuing until the Closing.

(f)     Payoff of Indebtedness.   The Company shall have delivered to Buyer (i) lien releases of any Liens and/or security interests evidenced by financing statements currently of record to perfect a security interest in the Assets of the Company in accordance with the Uniform Commercial Code ("UCC") shall be released.

(g)     Non-Foreign Status.   Each Seller shall have delivered to Buyer a certificate of non-foreign status dated as of the Closing Date, made under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code.

(h)     Closing Deliveries.   The Company shall have delivered or caused to be delivered to Buyer each of the documents listed in Section 6.2.

(i)     Financing.  Buyer shall have received satisfactory financing factoring agreements to fund this transaction, which is based in part upon sufficient levels of Accounts Receivable (at least $1 million not including any credits due customers) to fund the Purchase Price.   Buyer agrees to provide from time to time as requested updated current reports of Accounts Receivable under 90 days aged and updated current reports of WIP; such reports will be requested frequently

between the date of execution hereof and the Closing Date and may include but not to limited to updates on both the day before the Closing and the morning of the Closing.

(j)     Forms 5500.  The Sellers shall cause the Company to prepare and file completed applications and related Forms 5500 (including all required schedules and attachments) under the United States Department of Labor's "Delinquent Filer Voluntary Compliance Program" for each Employee Plan (and covering each plan year) for which a Form 5500 was required, but failed, to be filed.  The Sellers shall pay and be solely responsible for any applicable filing fees or penalties due with respect to such applications (the "Form 5500 Expenses")

(k)     Corporate Names.  Sellers shall, after Closing and after completion of, including but not limited to completion of signing and recording of trustee's deeds and related requirements relating to all sales scheduled and occurring on Friday, July 25, 2014 on files not included in the Assets including but not limited to those set forth in the Excluded Assets, work with Buyer to simultaneously file amendments (through CT corporation) with the respective secretaries of state to change the corporate names of RTSC and RSC and Buyer shall register for such names.

(l)     Continuity of Business.  Company shall cause Chris and other signing officers to generate all Company documents/Trustee's Deeds (for sales occurring on or before the Closing Date) for signature/notarization on or prior to the Closing Date , with the goal that Seller invoice all work completed prior to Closing to the extent practical and appropriate.  As set forth in the mTech Services Corporation Software License Agreement, invoices will continue to be generated through MDS, and upon Closing, Buyer's staff can generate (and upload into the necessary third party system) for any matters that were not completed by Seller's staff prior to Closing.

**5.2**   **Conditions to the Company's Obligations.**  The obligation of the Company to consummate the transactions contemplated hereby is subject to satisfaction on or prior to the Closing of the following conditions (any of which may be waived by the Company in writing):

(a)     Covenants, Representations and Warranties.  Buyer shall have performed all obligations and agreements and complied with all covenants contained in this Agreement to be performed and complied with by Buyer prior to or at the Closing. Each of the representations and warranties of Buyer set forth in Article III shall be true and correct in all material respects as of the date hereof and as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout Article III).

(b)     Consents.  All statutory requirements for the valid consummation by Buyer of the transactions contemplated by this Agreement shall have been fulfilled and all authorizations, consents and approvals, including those of any Governmental Authority required to be obtained in order to permit the consummation by Buyer of the transactions contemplated hereby shall have been obtained.

(c)     Litigation.  No Claims or Proceedings shall have been instituted before, or by, any Governmental Authority or other Governmental Authority, to restrain, modify or prevent the consummation of the transaction contemplated hereby, or to seek damages in connection with

such transaction, or that has or may be expected to have, a Material Adverse Effect on Buyer's right to own, operate, or control the Business. There shall be no financing statements filed against the Assets or any judgments or lien of any type that interferes with Seller providing warrantable good, clean and marketable title free and clear of all liens and encumbrances.

(d)     Closing Deliveries.   Buyer shall have delivered to the Sellers each of the documents listed in Section 6.3.

**ARTICLE VI**
**CLOSING**

**6.1     Closing.** The closing of the transactions contemplated hereby (the "Closing,") shall occur on a date which follows or is simultaneous with the satisfaction of all applicable conditions and covenants contained herein (the "Closing Date"). The Closing shall take place remotely via the exchange of documents by email between counsels for Buyer and Seller and is scheduled to occur on Monday, July 21·2014.

**6.2     Documents to be Delivered by the Company.** Company shall cause the following to be delivered to Buyer at the Closing:

(a)     Chris Employment Agreement.   The Employment Agreement dated as of the Closing Date, substantially in the form attached hereto as Exhibit C, duly executed by Chris Rebhuhn ("Chris' Employment Agreement").

(b)     Kaufman Employment Agreement. The Employment Agreement dated as of the Closing Date, substantially in the form attached hereto as Exhibit D, duly executed by Debbie Kaufman ("Kaufman Employment Agreement").

(c)     Lease Amendment. The Lease Amendment dated as of the Closing Date, substantially in the form attached hereto as Exhibit E, and duly executed by the Company's landlord ("Lease Amendment").

(d)     Tech Amendment. The Tech Amendment dated as of the Closing Date, substantially in the form attached hereto as Exhibit F, duly executed by Mtech Services Corporation ("Tech Amendment").

(e)     Certificate. A certificate executed by an executive officer of the Company dated as of the Closing Date, in substantially the form attached hereto as Exhibit G, authorizing the transaction.

(f)     Termination of Security Interests. If applicable, UCC termination statements, payoff letters and other applicable documentation necessary to release any interest of any third party in the Company's assets duly executed by the appropriate parties.

(g)     Transfer of Records. All contracts, files, documents, data, records and information of the Company relating to the Business, in all media and format, including historical data related to customers, the trust account, etc.; provided, that the Company may keep copies of any such contracts, files, documents, data, records and information that it deems necessary for

28

preparation of its Tax Returns or other filings or for which the Company has retained any obligation.

(h)   Consents. Evidence of (i) the fulfillment of all requirements for the valid consummation by the Company of the transactions contemplated by this Agreement and (ii) all third party authorizations, consents and approvals, including those of any Governmental Authority, required or recommended to be obtained in order to permit the consummation by the Company of the transactions contemplated by this Agreement and the Related Agreement, and for the Company to operate the Business after the Closing in substantially the same way as the Business was operated just before the Closing, in all cases in such form as may be reasonably acceptable to Buyer.

(i)   Non-Foreign Certificates. A properly completed and executed certificate of non-foreign status under Section 1445 of the Code from each Seller.

(j)   Transfer of Bank Accounts. Such documents as are necessary to transfer all Bank Accounts that are part of the Assets, which shall include only the trust escrow accounts, and all historical data and records regarding said trust escrow accounts, used in the Business.

(k)   Intentionally Deleted.

(l)   Bill of Sale. A bill of sale of the Assets supra, in the form attached hereto as Exhibit I.

(m)   Assignment and Assumption of Liabilities. A duly executed  Assignment and Assumption of Assumed Liabilities in the form attached hereto as Exhibit J ("Assignment and Assumption of Liabilities").

(n)   Possession of Premises. Possession of the Premises (as defined under the Lease Amendment) and other Assets, and all keys to the Premises.

(o)   Assignment of Intangible Property. A duly executed Assignment of Intangible Property in the form attached hereto as Exhibit K ("Assignment of Intangible Property") and such other documents as are necessary to transfer any and all intellectual property including but not limited to licenses to be acquired by Buyer.

(p)   Trade Name. Such documents as are necessary to permit the transfer or license of the names of the Business;

(q)   Intentionally Deleted.

(r)   Intentionally Deleted.

(s)   Joint Disclosure. release duly executed copy of the Joint Disclosure, to be agreed upon by the parties in substantially the form set forth in Exhibit L at Closing ("Joint Disclosure").

(t)   Miscellaneous. Any and all other instruments, records or correspondence called for hereunder which have not previously been delivered or as may be requested to satisfy the conditions precedent hereunder or fulfill any other conditions set forth hereunder, including not only the letter but the spirit of this Agreement.

Buyer may waive compliance on Sellers' part under any of the foregoing items by an instrument in writing.

**6.3    Obligations of Buyer.** The following shall be delivered to the Sellers at the Closing by Buyer:

(a)   The Promissory Note, duly executed by Cypress Innovations, Inc..

(b)   A duly executed Lease Amendment.

(c)   A duly executed  Assignment and Assumption of Assumed Liabilities.

(d)   A duly executed Assignment of Intangible Property.

(e)   A duly executed Joint Disclosure.

(f)   A duly executed Tech Amendment.

(g)   A duly executed Chris' Employment Agreement.

(h)   A duly executed Kaufman Employment Agreement.

(i)   A certificate executed by an officer of Buyer certifying Buyer's representations and warranties.

(j)   All other documents called for herein.

**6.4    Prorations.** The following are to be apportioned as of the Closing Date, as follows:

(a)   Rent.  Rents under the Real Property Leases shall be apportioned as of the Closing Date Seller shall be entitled to a credit against the Purchase Price for the total sum of all security deposits and prepaid rent paid under the Leases.

(b)   Utility Charges.  Seller shall cause all the utility meters to be read on the Closing Date, and will be responsible for the cost of all utilities used prior to the Closing Date, except to the extent such utility charges are billed to and paid by Buyer directly.

(c)   Preliminary Closing Adjustment.   Seller and Buyer shall jointly prepare a preliminary Closing adjustment on the basis of the RP Leases and other sources of income and expenses, and shall deliver such computation to the Title Company prior to Closing.

(d)   Post-Closing Reconciliation.   Subject to the provisions above, if any of the aforesaid prorations cannot be calculated accurately on the Closing Date, then they shall be calculated as soon after the Closing Date as feasible. Either party owing the other party a sum of

money based on such subsequent proration(s) shall promptly pay said sum to the other party, together with interest thereon at the rate of two percent (2%) over the average "prime rate" (as announced from time to time in the Wall Street Journal) per annum from the Closing Date to the date of payment if payment is not made within ten (10) days after delivery of a bill therefor.

(e)     Survival.  The provisions of this Section 6.4 shall survive the Closing.

## ARTICLE VII
## TAXES

7.1     **Transfer Taxes.**  The Sellers shall be responsible for, and shall pay when due, all transfer, documentary, excise, stamp, sales, use, recording, registration or similar Taxes or fees arising out of the sale, transfer, conveyance or assignment of the Assets by the Sellers and the Transaction, if applicable.  The Sellers shall make any filing under applicable Law with respect to such Taxes.

7.2     **Tax Matters.**   The Sellers shall be severally liable for and shall indemnify Buyer for Taxes of the Company incurred prior to Closing, including those taxes set forth in Section 7.1.

## ARTICLE VIII
## INDEMNIFICATION

8.1     **Survival.**  The representations and warranties of the Company set forth in Article II hereof or in the Schedules or Closing Certificates delivered pursuant to this Agreement or any Related Agreement shall terminate on the sixtieth (60) month anniversary of the Closing Date.

8.2     **Indemnification.**

(a)     Indemnification of Buyer.  Sellers agree that notwithstanding the Closing and regardless of any investigation made at any time by or on behalf of Buyer or of any information Buyer may have in respect of such investigation, Sellers will indemnify and hold harmless Buyer and each officer, director and affiliate of Buyer (collectively, the "Buyer Indemnified Parties") from and against any and all damages, losses, claims, liabilities, demands, charges, suits, penalties, costs and expenses (including court costs and reasonable attorneys' fees and expenses incurred in investigating and preparing for any litigation or proceeding) (collectively, the "Buyer Indemnifiable Costs"), which any of the Buyer Indemnified Parties may sustain, or to which any of the Buyer Indemnified Parties may be subjected, arising out of (A) any misrepresentation or breach of any of the representations and warranties made by the Company contained in this Agreement or any Related Agreement; (B) any failure by the Company to duly perform or observe any term, provision, covenant, agreement or condition in this Agreement or any Related Agreement on the part of the Company to be performed or observed (C) Taxes for which the Sellers are responsible pursuant to Article VII, and any liability for Taxes in connection with the matter listed on Schedule 8.2(a); (D) the Form 5500 Expenses; (E) any matter listed or required to be listed on Schedule 2.14; and (E) all matters relating to the Business on or before the Closing Date, including but not limited to past work for clients and work performed by Seller before Closing for clients on Active Files transferred to Buyer at Closing.

31

(b)     Indemnification of Sellers. Buyer will indemnify and hold harmless the Sellers and each trustee, beneficiary and affiliate of the Sellers (collectively, the "Seller Indemnified Parties") from and against any and all damages, losses, claims, liabilities, demands, charges, suits, penalties, costs and expenses (including court costs and reasonable attorneys' fees and expenses incurred in investigating and preparing for any litigation or proceeding) (collectively, the "Seller Indemnifiable Costs"), which any of the Seller Indemnified Parties may sustain, or to which any of the Seller Indemnified Parties may be subjected, arising out of (A) any misrepresentation or breach of any of the representations and warranties made by Buyer contained in this Agreement or any Related Agreement, or (B) any failure by Buyer to duly perform or observe any term, provision, covenant, agreement or condition in this Agreement or any Related Agreement on the part of Buyer to be performed or observed; and  (C) all matters relating to the Assets purchased or the Assumed Liabilities assumed as part of the Business on the Closing Date and thereafter, including work performed by Buyer on and after Closing for clients on Active Files transferred to Buyer at Closing.

8.3     **Limitations on Indemnification Obligations of Sellers.** The liability of the Sellers to Buyer under Section 8.2(a) shall be subject to the following limitations:

(a)     Deductible. The Sellers shall not be liable for indemnity under Section 8.2(a)(A) unless the aggregate amount of Buyer Indemnifiable Costs incurred by Buyer Indemnified Parties exceeds the sum $5,000 (the "Deductible"), in which case the Sellers shall be liable to Buyer for the full amount of such Buyer Indemnifiable Costs without regard to such Deductible. Notwithstanding the foregoing, the parties hereto agree and acknowledge that any indemnity relating to (i) any fraud, willful breach or intentional misrepresentation by the Company, or (ii) any representation or warranty contained in Section 2.1 (Due Organization and Qualification), Section 2.2 (Subsidiaries), Section 2.3 (Due Authorization),, Section 2.8 (Compliance with Licenses, Permits, Laws and Other Instruments), Section 2.11 (Employee Benefits) and Section 2.23 (Environmental) (collectively, the "Fundamental Representations"), shall not be subject to the Deductible.

(b)     Cap. The maximum amount of Buyer Indemnifiable Costs for which the Sellers shall be liable for indemnity under Section 8.2(a)(A) shall not exceed 100% of the Purchase Price; provided, that such cap shall not apply to any Buyer Indemnifiable Costs resulting from (i) any fraud, willful breach or intentional misrepresentation by the Company or the Sellers or (ii) the breach of any Fundamental Representation.

(c)     Materiality. Notwithstanding anything to the contrary contained in this Agreement, for purposes of the parties' indemnification obligations under this Article VIII, all of the representations and warranties set forth in this Agreement, or any certificate or schedule that are qualified as to "material," "materiality," "material respects," "Material Adverse Effect" or words of similar import or effect shall be deemed to have been made without any such qualification for the purposes of determining: (i) whether or not a breach of any representation or warranty has occurred, and (ii) the amount of any losses resulting from, arising out of, or relating to any such breach or misrepresentation.

(d)   Procedures for Indemnification.

(i)   Promptly after the discovery by any Buyer Indemnified Parties or Seller Indemnified Parties (each, an "Indemnified Party") of any Buyer Indemnifiable Costs or Seller Indemnifiable Costs, as applicable, or claim or breach, that might give rise to indemnification hereunder, the Indemnified Party shall deliver to the party obligated to provide indemnification under this Agreement (the "Indemnifying Party") a certificate (a "Claim Certificate") that:

A.   states that the Indemnified Party has paid or properly accrued Buyer Indemnifiable Costs or Seller Indemnifiable Costs, as applicable, or reasonably anticipates that it may or will incur liability for costs, for which such Indemnified Party is entitled to indemnification pursuant to this Agreement; and

B.   specifies in reasonable detail, to the extent practicable and available, each individual item of loss included in the amount so stated, the basis for any anticipated liability and the nature of the misrepresentation, default, breach of warranty or breach of covenant or claim to which each such item is related and, to the extent computable, the computation of the amount to which such Indemnified Party claims to be entitled hereunder provided, however that failure to give a Claim Certificate shall not affect any Indemnified Party's ability to seek reimbursement unless, and only to the extent that, such failure has materially and adversely affected the Indemnifying Party's liability.

If the Indemnifying Party objects to the indemnification of an Indemnified Party in respect of any claim or claims specified in any Claim Certificate, the Indemnifying Party shall deliver a written notice to such effect to the Indemnified Party within thirty (30) days after receipt by the Indemnifying Party of such Claim Certificate. Thereafter, the Indemnifying Party and the Indemnified Party shall attempt in good faith to agree upon the rights of the respective parties within thirty (30) days of receipt of such Claim Certificate with respect to each of such claims to which the Indemnifying Party has objected. If the Indemnified Party and the Indemnifying Party agree with respect to any of such claims, the Indemnified Party and the Indemnifying Party shall promptly prepare and sign a memorandum setting forth such agreement and. Should the Indemnified Party and the Indemnifying Party fail to agree as to any particular item or items or amount or amounts, then the parties shall resolve such dispute in accordance with Section 8.4 hereof.

(e)   Buyer Indemnifiable Costs. With respect to any Buyer Indemnifiable Costs incurred by Buyer other than any Specified Tax Costs, Buyer shall have an express right to offset against the Purchase Price. The Purchase Price shall not be the exclusive remedy with respect to such amounts.

(f)   Third-Party Claims. With respect to any third-party claim that Buyer believes, in good faith, may result in a demand by it for indemnification hereunder, the Sellers shall be entitled to approve any legal counsel retained by the Buyer (provided such approval shall be

33

unreasonably withheld, delayed or conditioned) and entitled to participate, at his or her sole cost and expense, in any defense of such claim. Notwithstanding the immediately preceding sentence, Buyer shall conduct and control such defense, and may settle any such claim with or without the consent of the Sellers.

8.4     **Non-Exclusive Remedy.** The rights set forth in this Article VIII are distinct, separate and cumulative remedies, are non-exclusive rights and remedies of the parties and are in addition to all other rights and remedies that may be available hereunder, at law or in equity.

## ARTICLE IX
## POST-CLOSING MATTERS

9.1     **Confidential Information.** Each Seller, by and through and including its owners and officers, acknowledges that, through his or its longstanding relationship with and involvement in the operation of the Company, he or she has gained or has had the opportunity to gain confidential and proprietary information concerning the business of the Company (the "Confidential Information"). Confidential Information is information that derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other Persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, and includes, but is not limited to, proprietary technology, operating procedures and methods of operation, financial statements and other financial information, trade secrets, market studies and forecasts, competitive analyses, pricing policies, the substance of agreements with customers and others, marketing and similar arrangements, servicing and training programs and arrangements, customer lists, other trade secrets and any other documents embodying confidential and proprietary information. Each Seller acknowledges that sharing this Confidential Information with third parties would be detrimental to Buyer and the Company and could place Buyer and the Company at a competitive disadvantage. Each Seller agrees that he or it shall not at any time following the Closing Date, directly or indirectly, disclose to any Person any Confidential Information. The foregoing restrictions and obligations under this Section 9.1 shall not apply to: (a) any Confidential Information that is or becomes generally available to the public other than as a result of a disclosure, directly or indirectly, by the Seller, (b) any information obtained by the Sellers from a third party which the Sellers have no reason to be believe is violating any obligation of confidentiality to Buyer, or (c) any information the Sellers are required by Law to disclose.

9.2     **Noncompetition.**

(a)     Each Seller, Aleta and Chris acknowledges that as a result of its or his affiliation with and involvement in the operation of the Company, it or he possesses Confidential Information and has significantly and uniquely contributed to the development and maintenance of the goodwill of the Company.

(b)     Each Seller, Aleta and Chris acknowledges that the Company has customers and clients located throughout, and conducts the Business throughout, the States of Nevada, California and Montana, Washington and Oregon. Each Seller, Chris and Aleta covenants and

agrees that during the period of three (3) years from the Closing Date, it or she shall not, anywhere within the States of Washington, Oregon, Alaska, Nevada and Arizona or any other states in which the Company has historically done business engage, directly or indirectly, as an agent, principal, manager, director, officer, employee, partner, member, or stockholder of any Person (other than the Company):, in any or all of the following activities:

> (i)     Enter into or engage in the Business or any other business competitive with the Business;

> (ii)    Request, solicit or induce, or attempt to request, solicit or induce, any employee of the Company, Buyer or any other subsidiary of Buyer to leave the employment of such Person for any reason whatsoever or hire any former employee of the Company, Buyer or any other subsidiary of Buyer for a period of two (2) years following termination of his or her employment with such Person, as applicable, or

> (iii)   Interfere with, disrupt or attempt to disrupt the relationship, contractual or otherwise, between the Company, Buyer or any other subsidiary of Buyer and any patient, supplier, lessor, lessee, employee or independent contractor of such Person or in any way encourage them to terminate or otherwise alter their relationship with the Company, Buyer or any other subsidiary of Buyer.

(c)     Each Seller recognizes that its, her or his breach of any of the provisions of Section 9.1 or this Section 9.2 would result in serious harm to Buyer for which monetary damages might not be an adequate remedy and that the amount of such damages would be difficult to determine. Therefore, if any Seller, Chris or Aleta breaches any provision of Section 9.1 or this Section 9.2, then Buyer shall be entitled to injunctive relief and specific performance in addition to any other available legal or equitable remedies. Buyer may recover by appropriate action the amount, if ascertainable, of the actual damage caused to Buyer by any failure, refusal or neglect of any Seller, Chris or Aleta to perform the agreements contained in Section 9.1 or this Section 9.2, together with any and all costs incurred by Buyer, including reasonable attorneys' fees, in seeking such relief. The remedies provided in this Section shall be deemed cumulative and the exercise of one shall not preclude the exercise of any other remedy at law or in equity for the same event or any other event.

(d)     It is the express intention of the parties hereto to comply with all Laws that may be applicable to Section 9.1 and this Section 9.2. It is the express intention of Buyer to restrict the Sellers', Chris' and Aleta's  activities only to the extent necessary to protect the legitimate business interests of Buyer. Each Seller, Chris and Aleta acknowledges and agrees that the time, geographic, and other restrictions in Section 9.1 and this Section 9.2 are only as broad as reasonably necessary to protect the Confidential Information and goodwill being acquired by Buyer. Nevertheless, should any restriction contained in Section 9.1 or this Section 9.2 be found to exceed in time, scope or space the restriction permitted by Law, it is expressly agreed that the covenants contained in Section 9.1 or this Section 9.2 shall be reformed or modified by the final judgment of a court of competent jurisdiction to reflect a lawful and enforceable duration, scope and space.

9.3     **Authority Filings and Notifications.**  The Sellers shall cooperate with Buyer and the Company in filing all notices, applications, and any other documentation required to effect the change of ownership and/or update ownership in the Company's Permits.

9.4     **Accounts Receivable received by Sellers on or after Closing.**  On and after the Closing Date, Sellers covenant to transfer by wire to an account or accounts designated by Buyer any and all funds received with respect to the Accounts Receivable within one (1) business day of receipt by Sellers, including but not limited to ACH funds, checks, cash, credit cards or any other sums.


**ARTICLE X**
**TERMINATION**

10.1    **Termination of Agreement.** This Agreement may be terminated at any time prior to the Closing only as follows:

      (a)     by mutual consent of Buyer, on the one hand, and the Sellers, on the other hand;

      (b)     by Buyer, if the Sellers shall have breached any of their respective representations, warranties, covenants or other agreements contained in this Agreement, which breach (i) would give rise to the failure of a condition set forth in Section 5.1 and (ii) is either incapable of being cured by the Sellers or, if curable, is not cured within Buyer's reasonable discretion within ten (10) days of receipt from Buyer of written notice thereof;

      (c)     by the Company, if Buyer shall have breached any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach (i) would give rise to the failure of a condition set forth in Section 5.2(a) and (ii) is either incapable of being cured by Buyer or, if curable, is not cured within the Company's reasonable discretion within ten (10) days of receipt from the Company of written notice thereof;

      (d)     by either Buyer, on the one hand, or the Company, on the other hand, if the transactions contemplated hereby have not been consummated by July 16, 2014; provided that neither Buyer nor the Company shall have a right to terminate this Agreement under this Section 10.1(d) if such terminating party is then in breach of this Agreement (unless such breach has been caused by the non-terminating party); and

      (e)     by either Buyer, on the one hand, or the Company , on the other hand, if any court, or other Governmental Authority shall have issued, enforced or entered any final and non-appealable Order that is in effect and makes the consummation of the transactions contemplated hereby illegal, so long as the existence of any such Order is not due to a breach of this Agreement by the terminating party.

10.2    **Effect of Termination.** Upon the termination of this Agreement pursuant to Section 10.1:

      (a)     Each party shall pay its own expenses in connection with the Agreement and the Transaction, whether or not the Transactions are consummated, including without limitation

36

attorneys' fees, accountants' fees, brokers' fees, other professional fees and costs related to expenses of officers, partners and managers.  Each party agrees to and shall indemnify the other parties hereto against any liability arising from any such fee or payment incurred by such party.

(b)    This Agreement shall be void and of no further effect, without any liability on the part of any party or its directors, managers, shareholders, members or officers, other than as set forth in this <u>Section 10.2</u>, and there shall be no liability by reason of this Agreement or the termination thereof on the part of Buyer or the Company, or their respective directors, managers, shareholders, members, officers, employees or agents, and all such parties shall be released from all such liability, provided that nothing herein will relieve any party from liability of its breach of this Agreement resulting in such termination or occurring prior to the termination.

(c)    The provisions of this <u>Section 10.2</u> shall survive the termination of this Agreement (in addition to other provisions of this Agreement which are specifically and expressly intended to survive such termination).

## ARTICLE XI
## MISCELLANEOUS

**11.1    Modifications; Waiver.**  Any amendment, change or modification of this Agreement shall be void unless in writing and signed by all parties hereto. No failure or delay by any party hereto in exercising any right, power or privilege hereunder, and no course of dealing between or among any of the parties, shall operate as a waiver of any such right, power or privilege. No waiver of any default on any one occasion shall constitute a waiver of any subsequent or other default. No single or partial exercise of any such right, power or privilege shall preclude the further or full exercise thereof.

**11.2    Notices.**  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when personally delivered, mailed by certified mail, return receipt requested, or via Federal Express or similar overnight courier service, or by facsimile. Such notices or other communications shall be sent to the following addresses, unless other addresses are subsequently specified in writing:

Buyer:

Cypress Innovations, Inc.
Attn: Bob Hosch
13800 Montfort Drive, Suite 300
Dallas, TX  75240

37

with a copy to:

Law Offices of Mary J. Drury & Associates
5130 South Fort Apache Road #215-290
Las Vegas, Nevada 89148
Attention: Mary J. Drury, Esq.
Fax No.: (702) 920-8369
Tel. No.: (702) 600-3554

and

Nicholas Drader, Esq.
Graham & Dunn
Pier 70
2801 Alaskan Way – Ste. 300
Seattle, WA 98121-1128
Tel. No.: (206) 340-9662
Fax No.: (206) 340-9599


Sellers:

RTSC and RSC c/o
Chris Rebhuhn
46519 SE 129th St
North Bend, WA  98045

with a copy to:

Aleta Lavandier
7142 NE William Rogers Road
Indianola, WA  98342

with a copy to:

Georges H. G. Yates
Perkins Coie
1201 Third Avenue
Suite 4900
Seattle, Washington  98101
Fax No.: (206) 359.4402
Tel. No.: (206) 359.3402


**11.3    Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which counterparts collectively shall constitute one instrument. Signatures may be exchanged by facsimile, with original signatures to follow. Each party hereto agrees that it will be bound by its own signature and that it accepts the facsimile signatures of the other parties hereto.

**11.4    Binding Effect; Assignment; No Third Party Rights.** This Agreement shall be binding upon and inure to the benefit of Buyer and the Company, their respective representatives, successors, and permitted assigns; provided, however, that no party may assign his, her, or its rights or obligations under this Agreement without the prior written consent of the other parties. Nothing expressed or referred to in this Agreement shall be construed to give any person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with

39

respect to this Agreement or any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this <u>Section 11.4</u>. Notwithstanding the foregoing, Sellers understand and agree that Buyer shall assign the Assets and the Assumed Liabilities to RTS Pacific, Inc., a Washington corporation, on the Closing Date. The Promissory Note shall remain in place between Buyer and Sellers although RTS Pacific, Inc. shall have an equivalent note due to Buyer.

11.5    Reserved

11.6    **No Strict Construction.** The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party hereto.

11.7    **Entire and Sole Agreement.** This Agreement and the other schedules and agreements referred to herein, constitute the entire agreement between the parties hereto and supersede all prior agreements, negotiations, representations, warranties, statements, promises, information, arrangements and understandings, whether oral or written, express or implied, with respect to the subject matter hereof, including any prior confidentiality agreement and confidentiality provisions of prior agreements.

11.8    **Governing Law; Jurisdiction and Venue.**

(a)    This Agreement shall be governed by and construed in accordance with the domestic Laws of the State of Washington, without giving effect to any choice of Law or conflict of Law provision or rule (whether of the State of Washington or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Washington. To the extent permitted by Law, each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of any state court or United States federal court, in either case sitting in King County in the State of Washington, over any action brought by any party arising out of or relating to this Agreement, and each of the parties hereto hereby irrevocably agrees that all claims with respect to any such suit, action or other proceeding shall be heard and determined in such courts.

(b)    THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS SHALL INSTEAD BY TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

11.9    **Invalid Provisions.** If any provision of this Agreement is deemed or held to be illegal, invalid or unenforceable, this Agreement shall be considered divisible and inoperative as to such

provision to the extent it is deemed to be illegal, invalid or unenforceable, and in all other respects this Agreement shall remain in full force and effect; provided, however, that if any provision of this Agreement is deemed or held to be illegal, invalid or unenforceable there shall be added hereto automatically a provision as similar as possible to such illegal, invalid or unenforceable provision and be legal, valid and enforceable. Further, should any provision contained in this Agreement ever be reformed or rewritten by any judicial body of competent jurisdiction, such provision as so reformed or rewritten shall be binding upon all parties hereto.

**11.10   Headings.** The descriptive section headings are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Agreement.

[SIGNATURES CONTINUED NEXT PAGE]

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed as of the date and year first above written.

**BUYER**

**CYPRESS INNOVATIONS, INC.,
A NEVADA CORPORATION**

By:_____

Printed Name: Robert H. Hosch, Jr.

Title: President

**COMPANY:**

**REGIONAL TRUSTEE SERVICES
CORPORATION, A WASHINGTON
CORPORATION**

By:_____
Name:_____
Title:_____
Date:_____

**REGIONAL SERVICE CORPORATION,
A CALIFORNIA CORPORATION**
By:_____
Name:_____
Title:_____
Date:_____

**SIGNATURE PAGE**

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed as of the date and year first above written.

BUYER

COMPANY:

**CYPRESS INNOVATIONS, INC.,**
**A NEVADA CORPORATION**

By: _____
Printed Name: Robert H. Hosch, Jr.
Title: President

**REGIONAL TRUSTEE SERVICES**
**CORPORATION, A WASHINGTON**
**CORPORATION**

By: _____
Name: Chris Ridlulin
Title: President
Date: 7/16/14

**REGIONAL SERVICE CORPORATION,**
**A CALIFORNIA CORPORATION**
By: _____
Name: Chris Ridlulin
Title: President
Date: 7/16/14

SIGNATURE PAGE

## JOINDER BY SPOUSES OF SELLERS

Chris and Aleta are each married. Aleta is married to Nicholas J. Lavandier and Chris is married to Meredith Rebhuhn. By signature below, each spouse waives any rights to the Shares under community property laws or otherwise by Joinder below and consents to the sale of the Assets to Buyer. Further, by signature below, Nicholas Lavandier hereby represents and warrants that the Company has no obligations relating to that certain Promissory Note dated September 30, 2008 for $1.26 million from Chris to Nicholas Lavandier and Aleta Lavandier and that Buyer is not assuming the same.

_____
**Meredith Rebhuhn**


_____
**Nicholas Lavandier**


**SIGNATURE PAGE**

## JOINDER BY SPOUSES OF SELLERS

Chris and Aleta are each married. Aleta is married to Nicholas J. Lavandier and Chris is married to Meredith Rebhuhn. By signature below, each spouse waives any rights to the Shares under community property laws or otherwise by Joinder below and consents to the sale of the Assets to Buyer. Further, by signature below, Nicholas Lavandier hereby represents and warrants that the Company has no obligations relating to that certain Promissory Note dated September 30, 2008 for $1.26 million from Chris to Nicholas Lavandier and Aleta Lavandier and that Buyer is not assuming the same.

_____
**Meredith Rebhuhn**


_____
**Nicholas Lavandier**



**SIGNATURE PAGE**

Exhibit A-1
Assets

All assets of RTSC and RSC except those identified as Excluded Assets on Exhibit A-2 as currently used to operate the Business as currently operated, wherever located.

For purposes of illustration and not limitation, those Assets of RTSC and RSC included in Purchase and Sale, include all Assets necessary or useful to operate the Business, which include but are not limited to the following:

all furniture, fixtures and equipment including but not limited to those set forth below, all Intangible Property servers including but not limited to those at the colocation facility in Oregon, all supplies on hand, all Accounts Receivables (which must include at least $1 million aged less than 90 days from the invoice date), all WIP, the corporate names for RTSC and RSC, all licenses, all bonds, etc. necessary to operate the businesses, all trust escrow accounts, all common law marks and other proprietary rights held by RTS and RTSC and any other similar names, all intellectual property held by RTS and or RTSC wherever located, which includes all data, historical and current, wherever held or located on the Active Files, all historical files for any clients for which Active Files are being transferred, all data regarding files with WIP and files on hold as well as all data, historical and current, on those matters in which Buyer is being transferred monies in the escrow account which Buyer is assuming.

FF&E

| | Workstation | Desk | Cabinet (this includes over workstation) | Chairs | Vending Machine | Conference Room | Break Rooms |
|---|---|---|---|---|---|---|---|
| 4th Floor | 42 | 1 | 13 | 49 | 2 | | 3 Couches, Fridge |
| 5th Floor | 29 | 2 | 29 | 30 | | 1 Table 12 Chairs | Fridge, 5 Tables 15 Chairs |
| 6th Floor | 14 | 4 | 24 | 24 | | | Fridge |
| 7th Floor | 22 | 0 | 11 | 2 | | | Fridge Table |
| **TOTAL** | 107 | 7 | 77 | 105 | | | |

Exhibit A-2
Excluded Assets


All Oregon customer files, including but not limited to the Active Files.

The escrow license and affiliated bond of RTSC in the State of Oregon.

And all files relating to sales scheduled and actually occurring during the period of July 21, 2014 through and including July 25, 2014 where an extension is not approved by the client, including but not limited to those set forth on the attached page:

| FNMA # | Servicer | Loan # | Milstone | State | Sale Date |
|---|---|---|---|---|---|
| 1701978138 | Flagstar Bank | 0501004919 | Sale Scheduled | WA | 7/25/2014 |
| 1711862369 | U.S. Bank Home Mortgage | 6800318400 | Sale Scheduled | WA | 7/25/2014 |
| 1696767018 | U.S. Bank Home Mortgage | 9900175684 | Sale Scheduled | WA | 7/25/2014 |
| 1711367698 | Nationstar Mortgage, LLC. | 0609538129 | Sale Scheduled | WA | 7/25/2014 |
| 1703368465 | Greentree Credit Solutions | 82452382 | Sale Scheduled | WA | 7/25/2014 |
| 1703377231 | Nationstar Mortgage, LLC. | 0609268867 | Sale Scheduled | WA | 7/25/2014 |
| 1706127831 | Greentree Credit Solutions | 82457756 | Sale Scheduled | WA | 7/25/2014 |
| 1705736168 | Nationstar Mortgage, LLC. | 0607683679 | Sale Scheduled | WA | 7/25/2014 |
| 1709202619 | Greentree Credit Solutions | 82458662 | Sale Scheduled | WA | 7/25/2014 |
| 1706871116 | Bank of America Home Loans | 78278487 | Sale Scheduled | WA | 7/25/2014 |
| 1705084548 | Greentree Credit Solutions | 82456374 | Sale Scheduled | WA | 7/25/2014 |
| 1706863298 | BOA | 871817899 | Sale Scheduled | WA | 7/25/2014 |
| 1704643649 | Greentree Credit Solutions | 82454556 | Sale Scheduled | WA | 7/25/2014 |
| 1703969900 | Greentree Credit Solutions | 82453738 | Sale Scheduled | WA | 7/25/2014 |
| 1701840212 | Nationstar Mortgage, LLC. | 0607421849 | Sale Scheduled | WA | 7/25/2014 |
| 1703269501 | Greentree Credit Solutions | 82439780 | Sale Scheduled | WA | 7/25/2014 |
| 1703791085 | BOA | 159407690 | Sale Scheduled | WA | 7/25/2014 |
| 1704603113 | BOA | 162987785 | Sale Scheduled | WA | 7/25/2014 |
| 1703065147 | BOA | 157231713 | Sale Scheduled | WA | 7/25/2014 |
| 1704806667 | BOA | 163270140 | Sale Scheduled | WA | 7/25/2014 |
| 1702642440 | BOA | 153723045 | Sale Scheduled | WA | 7/25/2014 |
| 1703791089 | BOA | 159383895 | Sale Scheduled | WA | 7/25/2014 |
| 1707415090 | BOA | 184283445 | Sale Scheduled | WA | 7/25/2014 |
| 1703236973 | BOA | 156512275 | Sale Scheduled | WA | 7/25/2014 |
| 1705127415 | Greentree Credit Solutions | 82454844 | Sale Scheduled | WA | 7/25/2014 |
| 1710853945 | Greentree Credit Solutions | 82459528 | Sale Scheduled | WA | 7/25/2014 |
| 4006110128 | Homestreet Bank | 429296 | Sale Scheduled | WA | 7/25/2014 |
| 1703513292 | BOA | 149225589 | Sale Scheduled | WA | 7/25/2014 |
| 1703158581 | BOA | 149282396 | Sale Scheduled | WA | 7/25/2014 |
| 1698560011 | BOA | 100661217 | Sale Scheduled | WA | 7/25/2014 |
| 1703145190 | BOA | 149177591 | Sale Scheduled | WA | 7/25/2014 |
| 1702707534 | BOA | 147700220 | Sale Scheduled | WA | 7/25/2014 |
| 1703357912 | BOA | 148385068 | Sale Scheduled | WA | 7/25/2014 |
| 1702696521 | BOA | 155446522 | Sale Scheduled | WA | 7/25/2014 |
| 1699688921 | BOA | 105834110 | Sale Scheduled | WA | 7/25/2014 |
| 1703493259 | BOA | 159552532 | Sale Scheduled | WA | 7/25/2014 |
| 1704370839 | Greentree Credit Solutions | 82453201 | Sale Scheduled | WA | 7/25/2014 |

Exhibit A-3
Assumed Liabilities

All obligations relating to the escrow funds as to all Active Files (except Oregon files) transferred to Buyer on and after the Closing Date.

The following equipment leases:

Lease 001-0634165-0 for Serial number HNA00533 with Canon Financial Services, Inc. (end date 3/31/16)

Lease (# pending) for Serial number HTK11109 with Canon Financial Services, Inc. (end date 9/10/17)

Contract 001-0634165-002 for HTK11122 with Canon Financial Services, Inc. (end date 9/1/17)

Pacific Northwest Business Products, Inc./Regional Trustee Services Agreement-Printer Supplies Contract (dated 4/11/2011)

Comcast Business Class Service Order Agreement (dated 5/6/2013)

WCI Master Service Agreement (dated 11/23/2011)

Exhibit A-4
Promissory Note

## UNSECURED PROMISSORY NOTE

$976,855.07

Seattle, Washington<br>Date: July 23, 2014<br>("Effective Date")

FOR VALUE RECEIVED, Cypress Innovations, Inc., a Nevada corporation ("Maker"), hereby unconditionally promises to pay jointly to the order of Regional Trustee Services Corporation, a Washington corporation and Regional Service Corporation, a California corporation ("Payee"), of the maximum sums advanced hereunder up to Nine hundred seventy-six thousand eight hundred fifty-five and 07/100DOLLARS ($976,855.07) ("Principal") together with interest at the rate set forth herein (the "Note"). Interest shall accrue on the Note at the fixed annual rate of four percent (4%) per annum ("Interest").

Payment Terms. Principal and Interest only on amounts outstanding hereunder shall be due and payable monthly in increments as the same accrue, on the 25th day of each and every calendar month of the first full calendar month following the Effective Date for five (5) years and are subject to offset as further set forth in that certain Asset Purchase Agreement between the parties (the "Purchase Agreement"). Payments shall be made jointly payable to Payee and shall be mailed for receipt by the Payee by the 25th day of each and every calendar month to the address provided by Payee no later than the tenth (10th) of each month, as the same may change from time to time by written notice. **Until notice is given of a new address, said monthly payments shall be mailed to: P.O. Box 4337, Seattle, WA 98194.**

Late Rate. If any payment due under this Note is not received by Payee by 5:00 p.m. Pacific Standard Time on the due date, the outstanding principal balance of this bear interest, from the date thereof until the date of such payment, at a rate per annum equal to five  (5%) (herein the "Late Rate").

Security. This Note is unsecured.

Default. If Maker fails to make any payment under this Note when due or fails to pay this Note in full or any other amount due under this Note on the due date in the manner and time specified herein, and Maker fails to cure any such default within fifteen (15) days after receiving written notice from Payee then, in any such event, the entire outstanding principal balance of this Note and other sums payable under this Note shall become immediately due and payable without further notice or demand, and Payee may forthwith exercise any and all remedies available to Payee at law and in equity as well as those remedies provided for herein.

Miscellaneous.

Maker and any endorsers of this Note hereby waive diligence, demand, presentment for payment, notice of nonpayment, protest, notice of dishonor and notice of protest, and specifically consent to and waive notice of any renewals, modifications or extensions of this Note, whether in favor of Maker or any other person or persons, and hereby waive any defense by reason of extension of time for payment or other indulgence granted by Payee.

1

No delay or failure of Payee in exercising any right, remedy or privilege under this Note shall affect such right, remedy or privilege, nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, remedy or privilege preclude any further exercise thereof or the exercise of any other right, remedy or privilege. The rights, remedies and privileges of Payee hereunder are cumulative and not exclusive of any rights, remedies or privileges which Payee would otherwise have. Any waiver, permit, consent or approval of any kind or character on the part of Payee of any breach or default under this Note, or of any provision or condition of this Note, must be in writing and shall be effective only to the extent specifically set forth in such writing. No notice to or demand on Maker shall entitle Maker to any other or further notice or demand in other similar circumstances. A waiver on any one occasion shall not be construed as a waiver or bar to any right, remedy or privilege on any other occasion.

All notices, consents or communications required under this Note shall be in writing and shall be deemed to have been properly given if sent by hand delivery, overnight courier or certified mail, postage prepaid, addressed to the parties at the addresses as set forth in the Purchase Agreement. If any provision of this Note or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, then neither the remainder of this Note nor the application of such provision to other persons or circumstances nor the other instruments referred to herein shall be affected thereby, but rather shall be enforced to the greatest extent permitted by applicable law.

Maker shall pay on demand all actual and direct damages, reasonable costs and expenses incurred by Payee in enforcing Payee's rights hereunder, together with all costs of collection incurred by Payee, including, without limitation, reasonable attorneys' fees and disbursements and costs and fees of appeal; all of which costs may be added to all other secured obligations, together with interest thereon at the Late Rate.

This Note may not be amended or modified except by a written agreement signed by the Maker and the Payee.

This Note is to be construed and enforced in all respects in accordance with the laws of the State of Washington. If any provision hereof is held to be invalid or unenforceable by a court of competent jurisdiction, the other provisions of this Note shall remain in full force and effect.

Time is of the essence of this Note and all of the obligations hereunder.

If there is a dispute regarding this Note, the prevailing party in such dispute shall be entitled to recover from the opposing party all reasonable costs on demand, including, without limitation, all costs of collection, attorneys' fees and disbursements and costs and fees of appeal.

Whenever used herein the words "Maker" and "Payee" shall be deemed to include, to the extent applicable, the heirs, successors and permitted assigns of Maker and of Payee.   This obligation shall bind Maker and, to the extent applicable, his successors and permitted assigns, and the benefits hereof shall inure to Payee and its successors and assigns.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, TO EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

MAKER:

CYPRESS INNOVATIONS, INC., a Nevada corporation

By: _____

Robert V. Hosch, Jr.
Title: President
Date: 7/23/14

## SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT

This SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT (this "AMENDMENT") is entered into effective as of July 23, 2014 by and among Cypress Innovations, Inc., a Nevada corporation or its affiliated assignee (the "Buyer"), Regional Trustee Services Corporation, a Washington corporation ("RTSC"), and Regional Service Corporation, a California corporation ("RSC", together with RTSC, collectively, the "Company" or the "Sellers").

### RECITALS

WHEREAS, Sellers and Buyer entered into that certain Asset Purchase Agreement dated effective July 16, 2014, as amended by the First Amendment to Asset Purchase Agreement dated July 21, 2014 (collectively, "Agreement"), providing for a Closing Date of July 23, 2014.

WHEREAS, due to a failure to obtain financing from multiple lenders, Sellers and Buyer desire to revise the Agreement to provide for a small loan of operating capital from Sellers to Buyer's assignee, RTS Pacific, Inc., as further set forth herein, in order to preserve the business as an operating entity.

WHEREAS, capitalized terms not otherwise defined herein are as defined in the Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the mutual representations, warranties, covenants, agreements, terms and conditions set forth below, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    Amendments:

(a)    Section 1.3 of the Agreement is hereby deleted and the following is inserted in its place:

> **1.3    Payment of the Purchase Price.** Subject to Section 5.1(i), the purchase price ("Purchase Price") for the Assets as valued with the assumption of the Assumed Liabilities will be an amount equal to seventy-five percent (75%) of the value of the Accounts Receivable as of Closing that is aged less than ninety (90) days from the invoice date with no adjustment for credits due customers plus equipment and other Assets valued at $50,000, such sum will be rolled into a Promissory Note in the form of Exhibit "A-4" ("Promissory Note"). Sellers and Buyer hereby acknowledge that for financing purposes only, the amount financeable was computed as of July 10, 2014, at $1,025,228.92 (which excludes $17,032.54, which are Accounts Receivable owed by an affiliate of Buyer, Cal-Western, for which Cal-Western will be paying before Closing to Sellers. The Promissory Note will be for five years at a four percent (4%) interest rate, payable in monthly installments of principal and interest.

Additionally, as a principal purpose of this Second Amendment, a separate note in the form of Exhibit "A-4-1" following the note referenced above, for $150,000 will be operating capital transferred by Sellers to Buyer's affiliate, RTS Pacific, Inc. due to failure of the financing contingency ("$150,000 Promissory Note"). Such $150,000 loan shall earn interest at seven percent (7%), with interest only payments due each month and the balance of the principal payable as a balloon payment in six months as further set forth in the $150,000 Promissory Note. The 1060 Allocation for the Assets shall be as set forth on Exhibit A-5 ("1060 Allocation"). Each party hereto agrees (i) that any such allocation shall be consistent with the requirements of Section 1060 of the Code, (ii) to complete jointly and to file separately Form 8594 with its Federal income Tax Return consistent with such allocation for the Tax year in which the Closing Date occurs, and (iii) that no party will take a position on any income, transfer or gains Tax Return, before any Regulatory Authority charged with the collection of any such Tax or in any judicial proceeding, that is in any manner inconsistent with the terms of any such allocation without the consent of the other party.

(b)     Section 6.1 of the Agreement is deleted in its entirety and the following is inserted in its place:

6.1     **Closing.** The closing of the transactions contemplated hereby (the "Closing,") shall occur on a date which follows or is simultaneous with the satisfaction of all applicable conditions and covenants contained herein (the "Closing Date"). The Closing shall take place remotely via the exchange of documents by email between counsels for Buyer and Seller and is scheduled to occur at the end of the day on Wednesday, July 23, 2014, after all sales take place on July 23, 2014 (as applicable) and all paperwork is completed, pursuant to Section 5.1(l) of the Agreement, amended above.

(c)     Section 6.3 is hereby amended with the following language:

(k)     The 150,000 Promissory Note, duly executed by RTS Pacific Inc.

(l)     The Guaranty of Robert H. Hosch, Jr. for the $150,000 Promissory Note.

(d)     Exhibit A-1 is amended to include the following:

$150,000 cash from the operating account of Sellers, in exchange for the $150,000 Promissory Note.

2.      Except as modified herein, the Agreement shall remain in full force and effect.

3.      This amendment may be executed in counterparts. Each of said counterparts, when executed and delivered, shall be deemed an original and, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be duly executed as of the date and year first above written.

**BUYER**

**CYPRESS INNOVATIONS, INC.,**
**A NEVADA CORPORATION**

By:_____
Printed Name: Robert H. Hosch, Jr.
Title: President

**COMPANY:**

**REGIONAL TRUSTEE SERVICES**
**CORPORATION, A WASHINGTON**
**CORPORATION**

By:_____
Name:_____
Title:_____
Date:_____

**REGIONAL SERVICE CORPORATION,**
**A CALIFORNIA CORPORATION**
By:_____
Name:_____
Title:_____
Date:_____

2.    Except as modified herein, the Agreement shall remain in full force and effect.

3.    This amendment may be executed in counterparts. Each of said counterparts, when executed and delivered, shall be deemed an original and, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be duly executed as of the date and year first above written.

**BUYER**                                           **COMPANY:**

**CYPRESS INNOVATIONS, INC.,**         **REGIONAL TRUSTEE SERVICES**
**A NEVADA CORPORATION**              **CORPORATION, A WASHINGTON**
                                                    **CORPORATION**
By: _____
Printed Name: Robert H. Hosch, Jr.          By: _____
Title: President                                    Name: _____
                                                    Title: _____
                                                    Date: _____


                                                    **REGIONAL SERVICE CORPORATION,**
                                                    **A CALIFORNIA CORPORATION**
                                                    By: _____
                                                    Name: _____
                                                    Title: _____
                                                    Date: _____

## GUARANTY

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, ROBERT H. HOSCH, JR., a Texas resident ("**Guarantor**"), hereby unconditionally and irrevocably guarantees for the benefit of REGIONAL TRUSTEE SERVICES CORPORATION, its successors and assigns ("**RTSC**") the full and prompt payment when due of the Obligations. "**Obligations**" means all of the payment obligations of Guarantor's affiliate, RTS Pacific, Inc., its successors and assigns ("**RTS Pacific**"), owed to RTSC pursuant to that certain unsecured Promissory Note dated as of the date hereof and attached hereto, as such note may be amended, from time to time by agreement of RTSC and RTS Pacific, with or without the consent of Guarantor.

This Guaranty is an absolute guaranty of payment and not a guaranty of collection. Upon any RTS Pacific's failure to pay any of the Obligations when due, RTSC may, at its option, and without first proceeding against RTS Pacific, proceed directly and at once, without notice, against Guarantor to collect and recover the full amount of the Obligations due together with any and all costs and expenses of collection and enforcement of its rights hereunder, including reasonable attorneys' fees (whether incurred at trial, on appeal, in arbitration or otherwise incurred).

Guarantor waives notice of acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notice of non-payment, non-performance or non-observance or demand. Guarantor agrees that the validity of this Guaranty and of Guarantor's obligations hereunder shall in no way be terminated or impaired by reason of (i) RTSC's failure to exercise, or delay in exercising, any right or remedy it may have against RTS Pacific, (ii) any amendment or revision of the Obligations agreed to by RTSC and RTS Pacific or (iii) any other circumstance that might otherwise constitute a legal or equitable discharge or defense of a guarantor, except payment in full of the Obligations and of Guarantor's other obligations hereunder.

Notwithstanding anything in this Guaranty to the contrary, this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any portion of the Obligations is revoked, terminated, rescinded or reduced or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of RTS Pacific as if such payment had not been made and whether or not RTSC has released this Guaranty and regardless of any prior revocation, rescission, termination or reduction.

This Guaranty shall be governed by, and construed in accordance with, the laws of the State of Washington, except to the extent preempted by federal laws. Guarantor and all persons and entities in any manner obligated to RTSC under this Guaranty consent to the jurisdiction of any federal or state court within the State of Washington having proper venue and also consent to service of process by any means authorized by Washington or federal law.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

Dated: July 23, 2014

ROBERT H. HOSCH, JR.

## Exhibit A

**Promissory Note**

See attached.

# PROMISSORY NOTE

$150,000.00

Seattle, Washington
Date: July 23, 2014
("Effective Date")

FOR VALUE RECEIVED, RTS Pacific, Inc., a Washington corporation ("Maker"), hereby unconditionally promises to pay jointly to the order of Regional Trustee Services Corporation, a Washington corporation and Regional Service Corporation, a California corporation, ("Payee"), of the maximum sums advanced hereunder up to One Hundred Fifty Thousand DOLLARS ($150,000.00) ("Principal") together with interest at the rate set forth herein (the "Note"). Interest shall accrue on the Note at the fixed rate of seven percent (7%) per annum ("Interest").

Payment Terms. Interest only on amounts outstanding hereunder shall be due and payable monthly in increments as the same accrue, on the 25th day of each and every calendar month of the first full calendar month following the Effective Date for six (6) months with a balloon due with the sixth payment on February 23, 2015, pursuant to that certain Asset Purchase Agreement between the parties (the "Purchase Agreement"). Payments shall be made jointly payable to Payee and shall be mailed for receipt by the Payee by the 25th day of each and every calendar month to the address provided by Payee no later than the tenth (10th) of each month, as the same may change from time to time by written notice. **Until notice is given of a new address, said monthly payments shall be mailed to: P.O. Box 4337, Seattle, WA 98194.**

Late Rate. If any payment due under this Note is not received by Payee by 5:00 p.m. Pacific Standard Time on the due date, the outstanding principal balance of this bear interest, from the date thereof until the date of such payment, at a rate per annum equal to ten (10%) (herein the "Late Rate").

Security. This Note is unsecured but a personal guaranty has been made by Robert H. Hosch, Jr., the principal of Maker to Payee.

Default. If Maker fails to make any payment under this Note when due or fails to pay this Note in full or any other amount due under this Note on the due date in the manner and time specified herein, and Maker fails to cure any such default within fifteen (15) days after receiving written notice from Payee then, in any such event, the entire outstanding principal balance of this Note and other sums payable under this Note shall become immediately due and payable without further notice or demand, and Payee may forthwith exercise any and all remedies available to Payee at law and in equity as well as those remedies provided for herein.

Miscellaneous.

Maker and any endorsers of this Note hereby waive diligence, demand, presentment for payment, notice of nonpayment, protest, notice of dishonor and notice of protest, and specifically consent to and waive notice of any renewals, modifications or extensions of this Note, whether in favor of Maker or any other person or persons, and hereby waive any defense by reason of extension of time for payment or other indulgence granted by Payee.

No delay or failure of Payee in exercising any right, remedy or privilege under this Note shall affect such right, remedy or privilege, nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, remedy or privilege preclude any further exercise thereof or the exercise of any other right, remedy or privilege. The rights, remedies and privileges of Payee hereunder are cumulative and not exclusive of any rights, remedies or privileges which Payee would otherwise have. Any waiver, permit, consent or approval of any kind or character on the part of Payee of any breach or default under this Note, or of any provision or condition of this Note, must be in writing and shall be effective only to the extent specifically set forth in such writing. No notice to or demand on Maker shall entitle Maker to any other or further notice or demand in other similar circumstances. A waiver on any one occasion shall not be construed as a waiver or bar to any right, remedy or privilege on any other occasion.

All notices, consents or communications required under this Note shall be in writing and shall be deemed to have been properly given to Maker at the address below and to Payee at the addresses as set forth in the Purchase Agreement if sent by hand delivery, overnight courier or certified mail, postage prepaid, addressed to the parties. If any provision of this Note or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, then neither the remainder of this Note nor the application of such provision to other persons or circumstances nor the other instruments referred to herein shall be affected thereby, but rather shall be enforced to the greatest extent permitted by applicable law.

Maker shall pay on demand all actual and direct damages, reasonable costs and expenses incurred by Payee in enforcing Payee's rights hereunder, together with all costs of collection incurred by Payee, including, without limitation, reasonable attorneys' fees and disbursements and costs and fees of appeal; all of which costs may be added to all other secured obligations, together with interest thereon at the Late Rate.

This Note may not be amended or modified except by a written agreement signed by the Maker and the Payee.

This Note is to be construed and enforced in all respects in accordance with the laws of the State of Washington. If any provision hereof is held to be invalid or unenforceable by a court of competent jurisdiction, the other provisions of this Note shall remain in full force and effect.

Time is of the essence of this Note and all of the obligations hereunder.

If there is a dispute regarding this Note, the prevailing party in such dispute shall be entitled to recover from the opposing party all reasonable costs on demand, including, without limitation, all costs of collection, attorneys' fees and disbursements and costs and fees of appeal.

Whenever used herein the words "Maker" and "Payee" shall be deemed to include, to the extent applicable, the heirs, successors and permitted assigns of Maker and of Payee. This obligation shall bind Maker and, to the extent applicable, his successors and permitted assigns, and the benefits hereof shall inure to Payee and its successors and assigns.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, TO EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**MAKER:**

RTS Pacific, Inc., a Washington corporation

By: _____
      Robert J. Hosch, Jr.
Title: President
Date: _July 23 2014_

Maker's notice address:
RTS Pacific, Inc.
Attn: Robert H. Hosch, Jr.
13800 Montfort Drive, Suite 300
Dallas, TX 75240

with a copy to:
Mary J. Drury
3615 South Town Center Drive, Suite 100
Las Vegas, Nevada 89135

# EXHIBIT B

**FILED**

14 AUG 05 AM 10:17

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 14-2-21548-7 SEA

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

In the Receivership of:

OLD RTSC CORP., a Washington
corporation

No. _____

PETITION FOR THE APPOINTMENT OF
A GENERAL RECEIVER PURSUANT TO
RCW 7.08.030(3) AND RCW 7.60.025(1)(j)

Old RTSC Corp. ("Assignor") petitions for the appointment of Pivotal Solutions, Inc., a Washington corporation ("Assignee") as general receiver for Assignor and states as follows:

1.      Venue is proper in King County pursuant to RCW 7.08.030(3) because Assignor is a Washington limited liability company with its principal place of business located at 315 5th Avenue S, Suite 700, King County, Seattle, Washington.

2.      Assignor is indebted to creditors, is unable to pay its debts when they become due, and desires to provide for the payment of its debts to the extent possible. Accordingly, on August 5, 2014, Assignor assigned, conveyed, transferred, and set over (the

PETITION TO APPOINT ASSIGNEE AS
RECEIVER – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

"Assignment") unto Assignee, all of Assignor's property for the benefit of Assignor's creditors pursuant to RCW 7.08.030(1).

3.     A true and correct copy of the Assignment, including the schedules required by RCW 7.08.030 and RCW 7.60.090(3), is attached hereto as Exhibit 1.

4.     On August 5, 2014, Assignee accepted the trust created by the Assignment and agreed to faithfully and without delay carry out Assignee's duties under the Assignment.

5.     Pursuant to the terms of the Assignment and RCW 7.08.030, Assignor consented to the appointment of the Assignee as general receiver in accordance with Chapter 7.60 RCW.

6.     RCW 7.08.030(4) provides, in pertinent part:

> A person to whom a general assignment of property for the benefit of creditors has been made shall be appointed as general receiver with respect to the assignor's property by the superior court upon the filing of a petition… [F]ollowing the assignee's appointment as general receiver, all proceedings involving the administration of the assignor's property and the claims of the assignee's creditors shall be governed by the provisions of chapter 7.60 RCW applicable to general receiverships and court rules applicable thereto.

7.     RCW 7.60.025(1)(j) further provides that appointment of a receiver is appropriate in accordance with RCW 7.08.030 in cases in which a general assignment for the benefit of creditors has been made.

8.     Pursuant to RCW 7.60.045 before entering upon duties of receiver, a receiver shall execute a bond with one or more sureties approved by the court, in the amount the court specifies, and conditioned that the receiver will faithfully discharge the duties of receiver in accordance with orders of the court and state law. Assignor requests that the court fix the amount of the receiver's bond at $5,000.

PETITION TO APPOINT ASSIGNEE AS
RECEIVER – 2

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

32984-0013/LEGAL122888582.1

WHEREFORE, Assignor prays for relief as follows:

1.     For entry of an order, a proposed form of which will be presented to the Court, granting the relief set forth therein which includes the appointment of Assignee as general receiver to take possession and control of Assignor's property, authorizing the Assignee to continue to operate Assignor's business pending liquidation of Assignor's property, and authorizing the Assignee to dispose of property and take other actions authorized by Chapter 7.08 and Chapter 7.60 RCW; and

2.     For such other and further relief as the Court deems just and equitable.

Dated: August 5, 2014

**PERKINS COIE** LLP

By: /s/ John S. Kaplan
    John S. Kaplan, WSBA No. 23788
    JKaplan@perkinscoie.com
1201 Third Avenue, Suite 4800
Seattle, WA 98101
Telephone:  206.359.8000
Facsimile:  206.359.9000

Attorneys for Assignor

PETITION TO APPOINT ASSIGNEE AS
RECEIVER – 3

32984-0013/LEGAL122888582.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47

**Exhibit 1**

**Assignment for Benefit of Creditors**

**(See Attached)**

PETITION TO APPOINT ASSIGNEE AS
RECEIVER – 4

32984-0013/LEGAL122888582.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# ASSIGNMENT

THIS ASSIGNMENT is made this _5th_ day of August, 2014, by and between Old RTSC Corp., with a principal place of business at 616 1st Avenue, Suite 500, Seattle, WA 98104 (hereinafter "assignor"), and Pivotal Solutions, Inc., which has an address of 451 SW 10th Street, Suite 107,  Renton, WA 98057 (hereinafter "assignee").

WHEREAS, the assignor has been engaged in the business of conduct non-judicial foreclosure sales and related activities

WHEREAS, the assignor is indebted to creditors, as set forth in Schedule A annexed hereto, is unable to pay debts as they become due, and is desirous of providing for the payment of debts, so far as it is possible by an assignment of all property for that purpose.

NOW, THEREFORE, the assignor, in consideration of the assignee's acceptance of this assignment, and for other good and valuable consideration, hereby grants, assigns, conveys, transfers, and sets over, unto the assignee, and the assignee's successors and assigns, all of assignor's property, except such property as is exempt by law from levy and sale under an execution (and then only to the extent of such exemption), including, but not limited to, all real property, fixtures, goods, stock, inventory, equipment, furniture, furnishings, accounts receivable, general intangibles, bank deposits, cash, promissory notes, cash value and proceeds of insurance policies, claims, and demands belonging to the assignor, wherever such property may be located (hereinafter collectively the "estate"), which property is, to the best knowledge and belief of the assignor, fully and accurately set forth on Schedule B annexed hereto.

By making this assignment, the assignor consents to the appointment of the assignee as a general receiver with respect to the assignor's property in accordance with chapter 7.60 RCW.

The assignee shall take possession and administer the estate, and shall liquidate the estate with reasonable dispatch and convert the estate into money, collect all claims and demands hereby assigned as and to the extent they may be collectible, and pay and discharge all reasonable expenses, costs, and disbursements in connection with the execution and administration of this assignment from the proceeds of such liquidations and collections.

The assignee shall then pay and discharge in full, to the extent that funds are available in the estate after payment of administrative expenses, costs, and disbursements, all of the debts and liabilities now due from the assignor, including interest on such debts and liabilities in full, according to their priority as established by law, and on a pro rata basis within each class.

In the event that all debts and liabilities are paid in full, the remainder of the estate shall be returned to the assignor.

To accomplish the purposes of this assignment, the assignor hereby irrevocably appoints the assignee as the assignor's true and lawful attorney in fact, with full power and authority to do all acts and things which may be necessary to execute and fulfill the assignment hereby created, to the same extent as such acts and things might be done by assignor in the absence of this assignment, including but not limited to the power to demand and recover from all persons all

property of the estate; to sue for the recovery of such property; to execute, acknowledge, and deliver all necessary deeds, instruments, and conveyances, and to grant and convey any or all of the real or personal property of the estate pursuant thereto; and to appoint one or more attorneys to assist the assignee in carrying out the assignee's duties hereunder.

The assignor hereby authorizes the assignee to sign the name of the assignor to any check, draft, promissory note, or other instrument in writing which is payable to the order of the assignor, or to sign the name of the assignor to any instrument in writing, whenever it shall be necessary to do so, to carry out the purposes of this assignment.

The assignor declares, under penalty of perjury under the laws of the state of Washington, that the attached list of creditors and of the property of the assignor is true and complete to the best of the assignor's knowledge

**Assignor:**

OLD RTSC CORP.

By: _____
     Chris Rebhuhn, President

STATE OF WASHINGTON      )
                               ) ss.
COUNTY OF KING               )

     I certify that I know or have satisfactory evidence that Chris Rebhuhn is the person who appeared before me, and said person acknowledged that he/she signed this instrument, on oath stated that he/she was authorized to execute the instrument and acknowledged it as President of Old RTSC Corp. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: _08/05/14_____

_____
Notary Public
Print Name _Constance O'Lague_____
My commission expires _07-19-17____

(use this space for notarial stamp/seal)

The assignee hereby accepts the trust created by the foregoing assignment, and agrees faithfully and without delay to carry out the assignee's duties under the foregoing assignment.

**Assignee:**

Pivotal Solutions, Inc.

By: _Richard A. Hooper_

Richard A. Hooper, President

STATE OF WASHINGTON      )
                                             ) ss.
COUNTY OF _KING_          )

I certify that I know or have satisfactory evidence that Richard A. Hooper is the person who appeared before me, and said person acknowledged that he/she signed this instrument, on oath stated that he/she was authorized to execute the instrument and acknowledged it as President of Pivotal Solutions, Inc. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: _08/05/14_

Notary Public
Print Name _CONSTANCE O'LAGUE_
My commission expires _7-19-17_

(use this space for notarial stamp/seal)

## SCHEDULE A -- CREDITOR LIST

1. List all creditors having security interests or liens, showing:

| Name | Address | Amount | Collateral | Whether or not disputed |
|------|---------|--------|------------|-------------------------|

None

2. List all wages, salaries, commissions, or contributions to an employee benefit plan owed, showing:

| Name | Address | Amount | Whether or not disputed |
|------|---------|--------|-------------------------|

None

3. List all consumer deposits owed, showing:

| Name | Address | Amount | Whether or not disputed |
|------|---------|--------|-------------------------|

None

4. List all taxes owed, showing:

| Name | Address | Amount | Whether or not disputed |
|------|---------|--------|-------------------------|
| None | Internal Revenue Service<br>Centralized Insolvency Operations<br>PO Box 7346<br>Philadelphia PA  19101-7346 | | |
| | Department of Revenue<br>Bankruptcy/Claims Unit<br>2101 4th Ave, Ste. 1400<br>Seattle WA  98121-2300 | | |
| | Office of the Attorney General<br>Bankruptcy & Collections Unit<br>800 Fifth Ave, Suite 2000<br>Seattle WA  98104 | | |
| | Department of Labor & Industries<br>Collections<br>PO Box 44171<br>Olympia WA  98504-4171 | | |
| | Employment Security Department<br>UI Tax Administration<br>PO Box 9046<br>Olympia WA  98507-9046 | | |

King County Treasury
Attn:  Linda Crane Nelsen
500 Fourth Ave, Suite 600
Seattle WA  98104

City of Seattle
Dept. of Finance
Revenue & Consumer
Protection Audit Unit
700 Fifth Ave, Ste. 4250
PO Box 34214
Seattle WA  98124-4214

5. List all unsecured claims, showing:

| Name | Address | Amount | Whether or not disputed |
|------|---------|--------|-------------------------|

***See Attachment A hereto***

6. List all owners or shareholders, showing:

| Name | Address | Percentage of Ownership |
|------|---------|-------------------------|
| Aleta Lavandier | 7142 NE William Rogers Road Indianola WA 98342 | 49% |
| Christopher Rebhuhn | PO Box 4337 Seattle, WA 98194 | 51% |

7. List all applicable regulatory agencies, showing:

| Name | Address |
|------|---------|

None

# ATTACHMENT A

Regional Trustee Service Corporation
Accounts Payable

**Known liabilities**

| Vendor | Address | Statement Amount | |
|---|---|---|---|
| Alaska Journal of Commerce | 301 Arcitic Slope Avenue, Suit 350, Anchorage, AK 99518 | $81,809.20 | |
| Alliance Title | 380 E Parkcenter Blvd Ste 105 \| Boise, ID \| 83706 | $382,839.76 | |
| American Title & Escrow | 1001 South 24th West Creejsudem Bld #2, Suite 200, Billings, MT 59107 | $657.00 | |
| AmeriTitle, Inc. | 345 SE Third, Bend, OR 97702 | $35.00 | |
| AmeriTitle, Inc. | P.O. Box 188, Ketchum, ID 83340 | $4,030.00 | |
| Chicago Title Company | 2707 Colby Avenue, Suite 601, Everett, WA 98201 | $101.00 | |
| Chicago Title Company of WA | 315 Court Street, Firday Harbor, WA 98250 | $91.00 | |
| Fidelity Title Seattle | 701 5th Ave, Suite 2560, Seattle, WA 98104 | $2,347.86 | |
| Fidleity Title of Alaska, LLC | 3150 C Street, Suite 220, Anchorage, AK 99503 | $639.00 | |
| First American | 3 First American Way, Santa Ana, CA 92707 | $1,027,618.74 | |
| First American Mortgage Service | File Number 50124, Los Angeles, CA 90074-0124 | $26,741.40 | |
| First American Title Company | 199 Country Lane, Jerome, ID 83338 | $1,175.00 | |
| First American Title Company | 924 Stonebride Drive, Suit 1, Bozeman, MT 59718 | $871.00 | |
| First American Title Company | P.O. Box 580, Blackfoot, ID 83221 | $402.00 | |
| First American Title Company | P.O. Box 596, Hamilton, MT 59840 | $1,234.00 | |
| First American Title Company | P.O. Box 868, Blackfoot, ID 83221 | $578.00 | |
| First American Title Company | P.O. Box 910, Ploson, MT 59860 | $35.00 | |
| First American Title Company of Montana, Inc. | 409 South Main, Suite 4, Conrad, MT 59425 | $21.00 | |
| First American Title Insurance Company | 44296 Sterling Hightway, Suite 2, Soldotna, AK 99669 | $2,227.00 | |
| First American/AK | 3035 C Street, Anchorage, AK 99503 | $16,352.00 | |
| First Amierican Title Insurance Company | 829 E USA Circle, Suite 101, Wasilla, AK 99654 | $5,723.00 | |
| First Idaho Title Company | 469 Washington Street, Montpelier, ID 83254 | $639.00 | |
| Old Republic Default Management SVC | 530 South Main Street, Suite 1031, Akron, OH 44311 | $1,884.06 | |
| Priority | 17501 Irvine Blvd, Suite 1, Tustin, CA 92780 | $330,440.96 | |
| Rocky Mountain Title Ins Closing SVC LLC | P.O. Box 268, Helena, MT 59624 | $589.00 | |
| Security Title Agency | 3636 N Central Avenue, 3rd Floor, Phoenix, AZ 85012-1971 | $2,460.00 | |
| ServiceLink ( formerly ASAP Sr Lien) | 601 Riverside Avenue; Jacksonville, FL 32204 | $20,050.00 | |
| ServiceLink (formerly ASAP) | 601 Riverside Avenue; Jacksonville, FL 32204 | $2,083,841.10 | |
| ServiceLink (formerly LPS Title) | 601 Riverside Avenue; Jacksonville, FL 32204 | $2,185,896.46 | Disputed |
| Stewart Title Company | P.O. Box 3387, Houston, TX 77253-3387 | $886.00 | |
| Summit Valley Title Company | 321 West Park Street, Butte, MT 59701 | $21.00 | |
| Yukon Title Company | 7414 Gaffney Road, FairBanks, AK 99701 | $6,016.00 | |
| Onewest Bank - Attn: Robert Jones | 2900 Esperanza Crossing, Austin, TX 78758 | $70,699.00 | |
| EverBank Attn: Erika Lewis | 301 West Bay Street, Jacksonville, FL 32202 | $42,545.10 | Disputed |
| Black Knight Financial Services, Inc. Attn: Gregg Kispert | 1270 Northland Dr., Suite 300, Mendota Heights, MN 55120 | $25,678.50 | |
| WrightFinlay&Zak | 4665 MacArthur Court, Suite 280, Newport Beach, CA 92660 | $19,569.39 | |

122928332v1

## Disputed Litigation Claims

| File Number | Borrower / Plaintiff | Plaintiff's Counsel |
|---|---|---|
| 01-FEE-103264 | HARTZMANN, Judith M. | Robbins & Herber, 3501 Rucker Avenue, Everett, WA 98201 |
| 01-OC-105450 //<br>01-FMS-76720<br>(same property,<br>diff. loan) | WALKER, Doug | Richard Llewelyn Jones, 2050 112th Avenue NE, Bellevue, WA 98004 |
| 01-FMB-103871 | BAVAND, Marisa | Richard Llewelyn Jones, 2050 112th Avenue NE, Bellevue, WA 98004 |
| 01-FMB-104305 | BAVAND | Richard Llewelyn Jones, 2050 112th Avenue NE, Bellevue, WA 98004 |
| 01-FMB-62059 | BAIN, Kristin | Melissa Huelsman, 705 Second Avenue, Ste 601, Seattle, WA 98104 |
| 01-OC-103517 | SHIELDS, Michael | Melissa Huelsman, 705 Second Avenue, Ste 601, Seattle, WA 98104 |
| 01-FHM-118041 | Michael Boykin and Timothy W. Gerth | Melissa Huelsman, 705 Second Avenue, Ste 601, Seattle, WA 98104 |
| 01-FWA-118633 | SOULE, Sheldon | Sheldon and Shauna Soule, 620 Fir Street, Edmonds, WA 98030 |
| 01-ALT-001419 | COATES // TSUTSUMI | Northwest Consumer Law Center, 520 East Denny Way, Seattle, WA 98112 |
| 1368740-34 | DOSS, Edmund and Jennifer | Ha Thu Dao, Grand Central Law, PLLC, 787 Maynard Avenue South, Seattle, WA 98104 |
| 01-CM-121886 | Four M Alliance Corp. | Law Offices of Jason Anderson, 8015 15th Avenue NW, Ste 5, Seattle, WA 98117 |
| 01-FWA-107252 | DVORNEKOVIC, Josip and Eileen | Eileen Dvornekovic, Petitioner c/o Temporary Mail Location c/o U.S.P.O. Postmaster 98395, c/o P.O. Box 577, on Wauna, the community on Washington, the landed nation on North America |
| 01-FMB-119481 | SHANNON, Adrian Belvin | In pro per.  Adrian Shannon, 509 North Sullivan Road, Spokane, WA 99037 |
| 01-FMB-122926 //<br>01-FMB-100929 | MELLON, Kelly & Cynthia | Delay, Curran, Thompson, Pontarolo & Walker, P.S., 601 West Main, Suite 1212, Spokane, WA 99201-0684 |
| 01-FMB-115957 | MIRONENKO, Nadezhda | In  pro per.  Nadezhda S. Mironenko, 23801 NW 1st Avenue, Ridgefield, WA 98642 |
| 01-XNC-123873 | BERGERON, Thomas E. and Carmen A. | John Long Law PLLC, 22525 SE 64th Place, Ste 262, Issaquah, WA 98027 |
| 01-FMB-119842 | WILLIAMS, Richard and Charlotte | In pro per.  Richard Williams, 19904 Des Moines Memorial Drive, Seattle, WA 98148 |
| 01-FEE-127255 | ROMERO, Carlos David | Barraza Law, PLLC, 14249 - F Ambaum Blvd SW, Burien, WA  98166 AND Ha Thu Dao, GRAND CENTRAL LAW, PLLC, 787 Maynard Avenue South, Seattle, WA  98104 |
| 01-FMB-127254 | ESHTAHARDY, Shaady | Melissa Huelsman, 705 Second Avenue, Ste 601, Seattle, WA 98104 |
| 01-FSL-119870 | BIG BLUE CAPITAL PARTNERS OF WA, LLC | Mueller & Associates, Inc. P.S., 2320 130th Avenue N.E., Suite 210, Bellevue, WA 98005 |
| 01-OC-63087 | LAWSON, Geoffrey R. | In pro per.  Geoffrey R. Lawson, Sr., P.O. Box 2291, Bremerton, WA 98310 |
| 01-FMB-114563 | LOGAN, J. Scott | Ha Thu Dao, Grand Central Law, PLLC, 787 Maynard Avenue South, Seattle, WA 98104 |
| 01-FWA-116153 | EASON, Susan and Andrew | Jeff E. Jared, 830 Kirkland Way, #203, Kirkland, WA 98033 |
| 01-FWA-110002 | WHEELER, Anthony J. | Arthur E. Ortiz, 4100 SW Edmunds Street, #222, Seattle, WA 98116 |
| 01-FMB-117195 | KITCHEN, Curtis and Angelique | In pro per.  Curtis and Angelique Kitchen, 343 19th Avenue, Seattle, WA 98122 |
| 01-OC-126407 | MUTTI, Kulwinder and Kirpal Sing Mutti | Northwest Consumer Law Center, 520 East Denny Way, Seattle, WA 98112 |
| 01-FCA-127913 | IGIELSKI, Timothy | Stafne Trumbull, LLC, 239 North Olympus Avenue, Arlington, WA 98223 |
| 01-XNC-123832 | LEHRMAN, Fredric | Sandlin Law Firm, PS, P.O. Box 1707, Prosser, WA 99350 |
| 01-FHF-130610 | JC Ephraim, Jr. | In pro per.  JC Ephraim, Jr., 12639 SE 213th Street, Kent, WA 98031 |

Disputed Litigation Claims

| File Number | Borrower / Plaintiff | Plaintiff's Counsel |
|---|---|---|
| 01-FKB-128816 | BORROWER: Dam Ho  PLAINTIFF:  Gree Tree Servicing LLC as Servicer for Federal National Mortgage Associaton | Fidelity National Law Group, 1200 - 6th Avenue, Suite 620, Seattle, WA  98101 |
| 01-FMB-114690 | HURNEY, John P. and Leslie A. | Melissa Huelsman, 705 Second Avenue, Ste 601, Seattle, WA  98104 |
| 01-OC-133826 | VAUGHAN, Matthew | John Long Law PLLC, 22525 SE 64th Place, Ste 262, Issaquah, WA  98027 |
| 01-RNM-129574 | GILLIN, John and Sharon | Arthur E. Ortiz, 4100 SW Edmunds Street, #222, Seattle, WA  98116 |

## Disputed Litigation Claims

| File Number | Borrower /PLAINTIFF | Plaintiff's Counsel |
|---|---|---|
| 09-NC-121131 | BOLLER, Suzanne and Danton | Thomas C. Peachey, P.C., 401 East 3rd Street, Suite 105, P.O. Box 2190, The Dalles, OR 97058 |
| n/a | CARRIGAN, Lisa and SCHICKLING, D. Jack and J. Lauren Schickling | In pro per.  Lisa Carrigan, PO Box 338, Veneta, OR  97487 and D. Jack Schlicking, PO Box 430, Veneta, Oregon  97487 and J. Lauren Schickling, PO Box 430, Veneta, OR  97487 |

Disputed Litigation Claims

| File Number | Borrower / Plaintiff | Plaintiff's Counsel |
|---|---|---|
| 08-OC-121762 | JOHNSON, Ronald W. | Wade J. Dahood/Jeffrey W. Dahood, KNIGHT, DAHOOD, EVERETT & SIEVERS, 113 East Third Street, PO Box 727, Anaconda, MT 59711 |

Disputed Litigation Claims

| File Number | Borrower / Plaintiff | Plaintiff's Counsel |
| --- | --- | --- |
| 07-FEE-101580 | GARCIA, Oscar | In pro per.  Oscar Garcia, 4381 Santa Maria Drive, Reno, NV  89507 |
| 07-FMB-74971 | LEE, Richard and ROACH, Aunetta | Rick Lawton, 5435 Reno Hwy, Fallon, NV  89406 |
| 07-FEE-116124 | BORROWER:  Lockett, L.T. PLAINTIFF:  Willow Vista Rentals, LLC | John T. Steffen, Peccole Professional Park, 10080 Alta Drive Ste 200, Las Vegas, NV  89145-8651 |
| 07-FSL-127416 | TURINGAN, Evelyn G. | Robert B. Noggle, 376 E. Warm Springs Road, Suite 140, Las Vegas, NV  89119 |

## Disputed Litigation Claims

| File Number | Borrower / Plaintiff | Plaintiff's Counsel |
|---|---|---|
| 02-FMB-67019 & 02-FMB-65205 | Richard William Breinhold and Susan Lyn Breinholt and Breinholt Family Foundation | Pro Se – 1976 Star Lane, Meridian, ID  83646 |

xls/122928012_1.xls

## Disputed Litigation Claims

| File Number | Borrower Last Name/Plaintiff | Plaintiff's Counsel |
|---|---|---|
| 05-NB-82891 | ROMERO, Javier A.  PLEASE NOTE:  Class action lawsuit. Numerous Plaintiffs. | Al McZeal, 9303 Paramount Blvd, Downey, CA  90240 |
| 05-FWA-89220 | MAGALLON, Guadalupe P. and Jesus Z. Magallon and Sofia Magallon | Pro Per.  Guadalupe P. Magallon, Jesus Z. Magallon and Sofia Magallon, In Pro Per, 1920 Oxford Ct., Salinas, CA  93906 |
| 05-FWA-114066 | GAOIRAN (BORROWER).  Plaintiff: Aurora Bank, FSB assignee of Homefield Financial, Inc. | Mark D. Epstein/William C. Acevedo/Gregory Jung, WENDEL, ROSEN, BLACK & DEAN LLP, 1111 Broadway, 24th Floor, Oakland, CA  94607 |
| 05-FWA-110213 // 05-FWA-125801 | PECAOCO, Alma | Pro Per.  Alma Pecaoco, 2311 Tamarack Way, Sacramento, CA  95821 |
| 05-FEE-64263 | CATO, Jerome | John S. Sargetis/Stephen J. Foondos, UNITED LAW CENTER, 3013 Douglas Blvd, Suite 200, Roseville, CA  95661 |
| 05-FWA-96569 | SALAMATI, Farshid | STANZLER LAW GROUP, 2275 East Bayshore Road, Ste 100, Palo Alto, CA  94303 |
| 05-FSL-113171 | WILSON, Jeffrey (BORROWER).  Plaintiff: The People of the State of California, acting by and through the Department of Transportation | Ronald W. Beals, Chief Counsel/David Gossage, Deputy Chief Counsel/Lucille Y. Baca, Asst. Chief Counsel/Helen H. Yoon, 595 Market Street, Ste 1700, San Francisco, CA  94105 |
| 05-PB-114429 /// 05-PB-114428 | RINCON ESCONDIDO, LLC (BORROWER).  Plaintiffs:  Dennis F. Esposito, Jr., Alisa G. Esposito, Trustee's, UTD 11/15/99 FBO, The Esposito Family | Charles D. Nachand/Richard B. Hudson, LAW OFFICES OF CHARLES NACHAND, 241 East Third Avenue, Escondido, CA  92025 |
| 05-FMB-81328 | Bernard Mitchell, S. Mitchell, as Trustee of the BSM Living Trust | R. Mitchell, Attorney at Law, 2132 Longview Drive, Ste A, San Leandro, CA  94577 |
| 05-FMB-92831 | Nathan G. Daniel, an individual and Nathan G. Daniel. Trustee of the Justice League Living Trust | Rose Spellman, LAW OFFICE OF ROSE SPELLMAN, INC., 10995 Eucalyptus Street, #J, Rancho Cucamonga. CA  91730 |
| 05-FSM-119235 | CORSETTI, Ray | Peter G. Riechert/Sarah A. Brooks, AARON, RIECHERT, CARPOL & RIFFLE, APC, 900 Veterans Blvd., Suite 600, PO Box 5787, Redwood City, CA  94063 |
| 05-FWA-119455 | Borrower:  MAZZONI.  PLAINTIFF:  Todd Perry, pro per | Todd Perry, 4320 Circuit Drive, Rocklin, CA  95677-2018 |
| 05-FSL-124127 | BORROWER:  RISHELL, Mark L.  PLAINTIFF:  Deutsche Bank National Trust Company, solely as trustee for Harborview Mortgage Loan Trust Mortgage Loan Pass-Through Certificates Series 2007-4 | Jeff Berke/Helga Hakimi, BERKE HAKIMI, 12400 Wilshire Blvd, Ste 400, Los Angeles, CA  90025 |
| 05-SF-77507 | HAYNES, Ralph and Rhonda | Francis M. McKeown, MCKEOWN & ASSOC.  2550 Ninths Street, Ste 202, Berkeley, CA  94710 |
| 05-FWA-122791 | TOLIVER, Vivian | Russell A. Wyatt, LAW OFFICE OF RUSSELL A. WYATT, 901 H Street, Ste 207, Sacramento, CA  95821 |
| 01-FWA-107252 | DVORNEKOVIC, Josip and Eileen | Eileen Dvornekovic, Petitioner c/o Temporary Mail Location c/o U.S.P.O. Postmaster 98395 c/o P.O. Box 577 on Wauna, the community on Washington, the landed  nation on North America |

xls/122928012_1.xls

Disputed Litigation Claims

| File Number | Borrower Last Name/Plaintiff | Plaintiff's Counsel |
|---|---|---|
| 05-FSL-126123 | SCHERMBECK, Marisa | Joseph L. De Clue, MILLENIA LAW OFFICES, 2280 Wardlow Circle #255, Corona, CA 92880 |
| 05-FIS-119843 | WATERS. Valerie and Gene | Pro se. Valerie and Gene Waters, 4293 Creed Avenue, Los Angeles, CA 90008 |
| 05-FWA-114851 | CISNEROS, Leonard G. and Gretel R. | Luis Camacho/Ravi K. Sakthivel, CAMACHO & ASSOCIATES, 1735 North First Street, Suite 245, San Jose, CA 95112 |
| 05-FWA-117073 | HOLLOWAY, Carl Lee | Carl Lee Holloway, 12219 Slater Avenue, Los Angeles, CA 90059 |
| 05-FWA-122851 | MARSCELLAS, Carl and Susan | Pro se. Carl and Susan Marscellas, 57 Calera Canyon Road, Salinas, CA 93908 |
| 05-FSL-125817 | ROMERO, Jose Miguel and Sonia Reynoso | Daniel Lucid, LUCID LAW, PLC, 164 North Second Avenue, Upland, CA 91786 |
| 05-FWA-114670 | LEE, Lawrence A. & Tricia A. | Pro se. Lawrence A. Lee and Tricia A. Lee, 47 Tillman Circle, Sacramento, CA 95823 |
| 05-FMB-80224 | CHAMBERLIN-LOMBARDO, Martha E. | The law Offices of Ronny Mor & Associates, 1501 India Street, Ste. 103-20, Can Diego, CA 92101 |
| 05-FWA-120822 | BORROWER: HULICK, Carl M. PLAINTIFF: P Assets, Inc., a California corporation | Michael S. Zar, Law Offices of Michael S. Zar, 2522 Chambers Road, Suite 100, Tustin, CA 92780 |
| 05-FWA-123309 | Janice L. Sullivan, as executor and successor trustee of the John L. Sullivan & Jewell O. Sullivan Revocable Trust dated March 17, 2000 | Armine Singh/Dianna Ter-Vardanyan, PRIME LAW GROUP, 101 N. Brand Blvd, PH1920, Glendale, CA 91203 |
| 05-FWA-122873 | POCE, Michael | Giandominic Vitiello/Yelena Katchko, KATCHKO, VITIELLO & KARIKOMI, 11500 W Olympic Blvd, Suite 400, Los Angeles, CA 90064 |
| 05-FWA-116862 | FONTANA, Dante | Joseph L. De Clue, MILLENIA LAW OFFICES, 2280 Wardlow Circle #255, Corona, CA 92880 |
| 05-FWA-126823 | Reba Bailey-Muhammad, as court appointed administrator for the estate of Laurin Muhammad | Joseph C. Crudo, 5445 Oberlin Drive, Suite 200, San Diego, CA 92121 |
| 05-FWA-129998 | Borrower: CATO, Jerome. PLAINTIFF: Juan Lopez | Nick Pacheco, 15501 San Fernando Mission Blvd, Suite 110, Mission Hills, CA 91345 |
| 05-FWA-130479 | LUNA, Jesus | Nick Pacheco, 15501 San Fernando Mission Blvd, Suite 110, Mission Hills, CA 91345 |
| 05-FSL-126855 | EAR, Mouy | Patricia Rodriguez, RODRIGUEZ LAW GROUP, INC., 1961 Huntington Drivelk #201, Alhambra, CA 91801 |
| 05-FWA-126086 | ALVAREZ, Antonio | Antonio Alvarez, 4266 Rosilyn Drive, Los Angeles, CA 90063 |
| 05-FWA-124065 | CHESLEY, Anita G. | Michael D. Maloney, 1851 Heritage Lane, Ste 148, Sacramento, CA 95815 |
| 05-FWA-118446 | Elia Viveros Giron | Barry S. Jorgensen, 634 N. Diamond Bar Blvd, Diamond Bar, CA 91765 |
| 05-FWA-130676 | GOMEZ, Joaquin and CONTRERAS, Rita | Nick Pacheco, 15501 San Fernando Mission Blvd, Suite 110, Mission Hills, CA 91345 |
| 05-FWA-125414 | GERARD, Julia | In pro per. Julia Gerard, 519 North Harper Avenue, Los Angeles, CA 90048 |
| 05-FWA-115525 | SCHOLAR, Aurelia and Arthur | Timothy G. McFarlin/Jarrod Nakano/Gary Dote, 4 Park Plaza, Ste 1025, Irvine, CA 92614 |
| 05-FWA-116315 | NARDICO, Darrio D. | Erikson M. Davis, 695 South Vermont Avenue, Ste 1100, Los Angeles, CA 90005 |
| 05-FWA-124573 | LONG, Nancy and Naser Long | Ronald Appel, APPEL & APPEL, 2522 Chambers Road, Tustin, CA 92780 |
| 05-FWA-126463 | GERARD, Julia | In pro per. Julia Gerard, 8611 Melrose Avenue, West Hollywood, CA 90069 |
| 05-FQS-111197 | MELCHOR, Marcos and Teresa | Mac E. Nehoray, NEHORAY LEGAL GROUP, 23945 Calabasas Road, Ste 212, Calabasas, CA 91302 |

xls/122928012_1.xls

## Disputed Litigation Claims

| File Number | Borrower Last Name/Plaintiff | Plaintiff's Counsel |
|---|---|---|
| 05-FWA-122856 | LINDBERG, Heddi | Vernon Bradley, LAW OFFICES OF VERNON L. BRADLEY, Waldo Point Harbor, 54 Liberty Dock, Sausalito, CA  94965-3106 |
| 05-FWA-125428 | ALTAMIRANO, Alexis and Gemma | Charles T. Marshall, 415 Laurel Street #405, San Diego, CA  92101 |
| 05-FMG-105236 | SHIMODA, Toshio | Stephen R. Golden, 224 North Fair Oaks Avenue, 3rd Floor, Pasadena, CA  91103 |
| 05-FWA-131024 | BORROWER:  SPEARMAN, Prentice  PLAINTIFF: Cruz, Collander & Carolina | Small Claims Court.  Address for Plaintiff:  1462 Santa Sierra Drive, Chula Vista, CA  91913 |
|  | PLAINTIFF: Flores, Francisco A. | Daniel Lucid, LUCID LAW, PLC, 164 North Second Avenue, Upland, CA  91786 |

## SCHEDULE B -- LIST OF PROPERTY

List each category of property and for each give approximate value obtainable for the asset on the date of assignment/appointment of the receiver, and address where asset is located.

I. Nonexempt Property

| | | Description and Location | Liquidation Value on Date of Assignment/Appointment of Receiver |
|---|---|---|---|
| 1. | Legal Description and street address of real property, including leasehold interests: | None | |
| 2. | Fixtures: | None | |
| 3. | Cash and bank accounts: | KeyBank<br>Mailcode: WA-31-99-0163<br>815 2nd Avenue<br>Seattle, WA 98104 | $30,118.68 |
| 4. | Inventory: | None | |
| 5. | Accounts receivable: | Unsecured Promissory Note from Cypress Innovations, Inc. dated July 23, 2013 | $976,855.07 |
| | | Promissory Note from RTS Pacific, Inc. dated July 23, 2014 | $150,000 |
| | | Account Receivable from Cal-Western | $118,651.09 |
| | | Account Receivable from RTS Pacific | $ 21,046.76 |
| 6. | Equipment: | None | |
| 7. | Prepaid expenses, including deposits, insurance, rents, and utilities: | None | |
| 8. | Other, including loans to third parties, claims, and choses in action: | None | |

II. Exempt Property

| | Description and Location | Liquidation Value on Date of Assignment/Appointment of Receiver |
|---|---|---|
| | NONE | |

- 3 -